WINTERS v. COWEN et al.

(Circuit Court, N. D. Ohio, W. D.   October 10, 1898.)

No. 1,418.

1. CARRIERS OF PASSENGERS—SALE OF TICKETS—REPUDIATION OF CONTRACT.
    A railroad company which authorizes another company to issue and
    sell mileage tickets good over its road makes the latter company its
    agent, and cannot repudiate the contract so made with a passenger who
    in good faith buys a ticket from such agent.

2. EXEMPLARY DAMAGES—INCLUDING EXPENSES OF LITIGATION.
    Under the decisions of the Ohio courts, where punitive or exemplary
    damages are allowable, the jury may take into consideration the fair and
    reasonable expenses to which the plaintiff has been subjected in the
    vindication of his rights by litigation.

3. SAME—IMPLIED MALICE—EJECTMENT OF PASSENGER BY CARRIER.
    Where the general passenger agent of defendant railroad company
    deliberately repudiated a large number of mileage tickets which had
    been issued and sold to the public by his·authority, and, in consequence
    of his orders, plaintiff, who had purchased one of such tickets in good
    faith, was ejected from a train, such a reckless disregard of the duties
    of the defendant and the rights of its ticket holders, by one of its con-
    trolling·officers, constituted implied malice, and warranted the imposition
    of exemplary damages.

On Motion for New Trial.

Motter & McKenzie and James M. Brown, for plaintiff.
J. H. Collins, for defendants.

HAMMOND, J.   Briefly, the facts are that the defendants and the
Cincinnati, Jackson & Mackinaw Company had an interchangeable
mileage book arrangement, and, by a ticket agent at Cincinnati, sold
one of the books to the plaintiff.   It was repudiated by the defend-
ants, and the plaintiff was ejected from their train without violence,
indignity, or other injury than that resulting from the inconvenience
and delay incident to the occasion, as it appears in the proof.   The
Mackinaw Company had sent for sale in bulk at wholesale something
over 600 of these books to the agent in Cincinnati.   Instead of sell-
ing for cash, as he was expected to do, he trusted the broker, who did
not pay, and, failing to recover them, the Mackinaw Company in-
structed all its conductors to outlaw every book presented within the
designated numbers covering the 600 books.   It also demanded of the
defendants that they should reject, according to a list of the numbers,
each of these 600 outlawed books; but the defendants, declining to
take this burden, repudiated its contract by refusing to receive any
book whatever issued by the Mackinaw Company, and so instructed
their conductors.  The plaintiff's book was not in the outlawed list, hav-
ing been purchased before the trouble arose.   The correspondence be-
tween the general passenger agents of these two companies, who were
the officials responsible for this ejection of the plaintiff, shows how
recklessly they disregarded the rights of the public holding their in-
terchangeable mileage books, innocently, and without notice of any
trouble in the premises.   It was an entirely unjustifiable performance
on their part to ignore the right of the plaintiff certainly, and others
of the public who had bought books unaffected with the alleged in-

firmity. Even as to the 600 tickets, they were not stolen or embezzled or counterfeited; nor were they in any sense defective on their face or in their issue. By their own neglect the companies had put them on the market without receiving, as they expected, cash for them; and the proposition was to impose this loss on the public, or, at least, to mitigate it by putting all holders to the trouble of an investigation, delay, and expense of attention to the matter of securing a refunding of their money, which comparatively few would incur perhaps. These superior officials did not seem to care for the loss, inconvenience, or injury resulting from the rejection of their tickets to passengers; nor for the human indignation they would feel at being put off a train while holding a good ticket, or else being forced to pay fares unlawfully demanded, with only a suggestion to carry their complaints to a distant headquarters, and show that they had a good claim against the company,—to prove that they were innocent of the offense of buying a ticket which the company had itself placed on the market, but which, through the mismanagement of its own agents, had been sold to brokers on a credit that had failed. And on the witness stand neither of them seemed to regret the predicament of the plaintiff, or to recognize that he had the least ground of complaint on any score. The purchase money of his ticket was not tendered, even by the pleadings here, or otherwise. My purpose in charging the jury was to restrain their natural sense of the outrage of this transaction, and to confine their verdict within temperate limits. It is rather larger than I would have given if on the jury, or if the case had been tried without a jury, for the reason that the conductor's treatment of the plaintiff was so very gentlemanly, and he discharged the disagreeable duty imposed by his superiors with so much regard for the plaintiff's situation that there is no just cause for complaint of his conduct on that occasion.

There was an incident occurring at the trial which possibly inflamed the jury somewhat, though everything was done by the court to prevent that mishap, it being quite apparent that the defendants here sued were not responsible for it, nor their counsel. Shindler, the Mackinaw Company's passenger agent at that time, and who was largely, if not entirely, responsible for the reckless disregard of the rights of the plaintiff in the premises, by assuming, as he did, that he might reject perfectly good tickets sold to unsuspecting purchasers, and forcing the defendants, by his unreasonable demands, to assume that they might lawfully reject all tickets, good or bad, because it was burdensome to them to distinguish good from bad, was called as a witness for the plaintiff. He demanded of the plaintiff in open court, before the jury, that his fees and mileage should be paid before he would testify; and, this being ruled in his favor, they were paid. When it was developed in the testimony that he was largely responsible for the trouble, there was an evident dissatisfaction at his ill-natured demand for his fees in advance; but the court, by admonition and restraint of counsel, protected the defendants against any undue influence of the incident. So, take it altogether, there is no reason for setting aside the verdict for $1,000, because it is too large.

The main ground urged for a new trial is the contention that the de-

fendants were not perpetually bound by their contract for interchange-able mileage tickets, and might revoke it, leaving the purchasers from the Mackinaw Company to look to them to refund the purchase money. The answer to this is that the plaintiff purchased his book before this trouble arose, and it was already a contract with defendants. But, beyond this, these tickets were pro hac the defendant's own tickets, and the issuing company's agents were its own agents for their sale. They should have been withdrawn from use with due regard to the rights of holders, or from the hands of agents, and not exposed to sale; for surely the traveler who goes to an authorized agent having the tickets on hand, and offering them for sale, cannot be required to investigate the traffic contracts to see if they do in fact authorize their sale. Once they are authorized and put upon the market, an innocent purchaser, without knowledge of the revocation of authority, would be protected in their purchase, by enforcing the contract of carriage in his favor. This is the familiar law of agency and the law of sale of such paper as railroad tickets. Railroad Co. v. Winter, 143 U. S. 60, 69, 12 Sup. Ct. 356.

The concern I have had about the instructions to the jury relate to the matter of exemplary damages. The distinction taken between punitive and exemplary damages may not be technically correct, but it was designed to eliminate from the minds of the jurors any disposition to punish the defendants, and yet to permit them to enlarge their verdict, if they saw fit, by allowing exemplary damages to the extent of reasonable compensation for necessary expenses of vindication by litigation not strictly falling within the bill of costs, such as a reasonable compensation to attorneys. The jury was told that:

"The plaintiff has a right to recover whatever reasonable and temperate sum of money will compensate him for his actual losses as they appear in the proof, to which you may rightly add such sum as, in your judgment, will protect the public against wrongful acts of like character by common carriers,—by way of example, not by way of punishment, for I wish to insist upon a distinction between the two, whether it be a technical distinction or not. It is a practical distinction, which we should bear in mind so as not to be misled by the bare use of words. Every common carrier owes the public a duty in this respect, somewhat different from other parties to a contract; and it is for the vindication of that public duty that the law permits jurors to go beyond mere compensatory damages, and allow exemplary damages, where there has been nothing but erroneous judgment, and yet a reckless disregard of the duty of a public carrier to comply with its contract of carriage and recognize the tickets it issues which are binding upon it; and sometimes the law permits jurors, where there has been actual insult and personal injury, degradation, and humiliation, to add smart money or punitive damages."

There was an application of this to the facts of the case, and it was further explained that, in this principle of giving exemplary damages, reasonable allowance might be made by the jury, if they thought the case was one for exemplary damages, for incidental expenses and attorney's fees that could not be recovered if there were only a case for compensatory damages and nothing more. It might not be lawful to take proof of the lawyer's fees and expenses to be allowed as such, by way of compensation; but, if the jury determined to give exemplary damages on the facts, they could consider that the plaintiff had been

at such expense necessarily, and fix the amount so as to cover such fair and reasonable estimate as they might make.    This is the substance of the instructions, and, on the authority of the Ohio cases, I am disposed to adhere to them as correct.    Roberts v. Mason, 10 Ohio St. 278; Railroad Co. v. Ensign, 10 Ohio Cir. Ct. R. 21; Railway Co. v. Ensign, 56 Ohio St. 760, 49 N. E. 1115.    That was a strong case for punitive damages, in an action for assault and battery; but, if the case be one for only exemplary damages,—if there be a distinction,— I am not able to see why the same principle does not apply.    Modern cases have somewhat mitigated the law against carriers in this matter of exemplary damages, by excluding from its allowance those cases where the agent of the carrier was acting outside the scope of his duty, and the malice, express or implied, was that of the agent, and not the principal.    Or, to state it otherwise, that breach of public duty, which is so flagrant in its character that it demonstrates that there has been a reckless disregard of the right of the public in the particular case of the passenger who is wrongfully ejected, must be, in the given case, a breach by the carrier company itself, in the sense that the wrongful act constituting the breach was an authorized act, and not the mere individual act of the agent, done beyond the scope of his authority.    Such a reckless disregard is implied malice, or is the equivalent of malice, in a technical or legal sense, for which the law allows exemplary damages, as well as for actual malice or ill will; but it must be in its implication attributable to the carrier, and not to the particular employé on his individual account, unless it may be that the recklessness is founded in the act of the carrier in selecting an incompetent employé or agent; and, where there is no blame in the selection of the agent, the test is that of his authority,— the scope of his authority.

In my judgment, this case falls rather within the category of the case of Railroad Co. v. Harris, 122 U. S. 597, 609, 7 Sup. Ct. 1286, than that of Railway Co. v. Prentice, 147 U. S. 101, 110, et seq., 13 Sup. Ct. 261.    It is true, there was no physical violence in this case, and the recovery of exemplary damages here in no sense depends upon the treatment of the plaintiff by the conductor, and it is not at all like the last-cited case.    Nor was there any such flagrant criminality as was found in the other case just cited, by the "controlling officers," to use the language of the opinion, who wantonly disturbed the peace of the community.    But this is only a difference in degree.    The disregard of the plaintiff's right was, in the nature of that right and its relation to this subject of exemplary damages, just as flagrantly wrongful in the one case as the other, and the principle of making an example for the benefit of others is equally applicable.    It is not the character or extent of the injury that invokes the principle, and these cited cases all say that the exemplary damages are not given in behalf of the plaintiff, nor to soothe his injuries, but in behalf of the public, which has been wronged, the public right being vindicated through the plaintiff.    This principle is especially applicable to common carriers, and to enforce the rights of those who must resort to them for that service.    Therefore, we do not, as in the cases of trespassers upon persons or property producing physical injuries by violence, rely

altogether upon that character of injury to determine the right of the public, through the jury, to impose exemplary damages. Those considerations may enter into the amount of the damages, but the right to inflict them depends upon the purpose to compel attention to a public duty. Mr. Justice Gray, in the Prentice Case, supra, cites and approves a case from Rhode Island where, on the facts of that case, exemplary damages were refused; but the approved principle of law quoted from that case fully covers this, and justifies the instructions given to the jury. Hagan v. Railroad Co., 3 R. I. 88. The use of the word "criminality" in these opinions must not be misunderstood as meaning offenses under the criminal law, but only such indifference of others' rights as amounts to criminal or censurable negligence.

After referring to cases of aggravated misconduct or lawless acts, and saying that "the discretion of the jury in such cases is not controlled by any very definite rules," Mr. Justice Field, in Railroad Co. v. Humes, 115 U. S. 512, 519, 6 Sup. Ct. 110, 113, uses this language:

"For injuries resulting from a neglect of duties, in the discharge of which the public is interested, juries are also permitted to assess exemplary damages. These may perhaps be considered as falling under the head of cases of gross negligence, for any neglect of duties imposed for the protection of life or property is culpable, and deserves punishment."

See, also, Scott v. Donald, 165 U. S. 58, 86–89, 17 Sup. Ct. 266; Milwaukee v. Arms, 91 U. S. 489, 495, where Mr. Justice Davis states the rule thus:

"To do this, there must have been some willful misconduct, or that entire want of care which would raise the presumption of a conscious indifference to consequences."

Ill will is not necessary to constitute malice in law. It is enough if the act be wrongful, done intentionally, without just cause or excuse. Bromage v. Prosser, 4 Barn. & C. 247, 255.

In this case the "controlling officers" of the two companies, charged with the entire duty of regulating the passenger traffic and the management of this business between themselves and the public, after entering into a contract for interchangeable mileage tickets, putting them upon the market, and selling one of them to the plaintiff, without the least justification in fact or law, repudiated their contract with him; and this, under circumstances showing the most entire want of care in the premises. This, certainly, does raise a conclusive presumption of a conscious indifference to consequences. They consulted no counsel in a grave matter of legal liability, and, upon their own assumptions of law, acted recklessly and wholly in disregard of the rights of all ticket holders similarly situated as the plaintiff was. Without manifesting the least regret for the injury to the plaintiff, they showed on the witness stand a confidence in their own knowledge of the legal liability and duty imposed by the circumstances under which they acted, that demonstrated the conceit of their own infallibility. It well accounts for their selfish attention to their own profit, convenience, and comfort in the matter of dealing with the tickets they had put out and wished to recall, and at the same time their reckless and wanton inattention and care for the rights of the public. Motion overruled.