# THE CHESAPEAKE AND OHIO RAILROAD CO.,

*v.*

# HOWARD.

RAILROADS; LEASE; ULTRA VIRES; CORPORATIONS; NEGLIGENCE; RELEASE; FRAUD; EVIDENCE; APPELLATE PRACTICE.

1. Where in an action against a railroad company to recover damages for personal injuries to a passenger, the évidence tends to show an arrangement by the defendant company to operate the road upon which the accident complained of occurred, it is a question for the jury whether the defendant company was at the time engaged in the operation of such road.

2. A right of action against a railroad corporation for personal injuries on a road operated under an illegal lease will not be affected by a subsequent confirmatory statute.

3. A railroad corporation which has filed articles of association in the State of West Virginia and is authorized to transact business therein, although organized for that purpose, has no power to lease the line of another company, where it is not lawfully engaged in the operation of the connecting line, and has not undertaken the construction of such a line as contemplated by W. Va. Code, Ch. 53, Sec. 54.

4. That a railroad company leased and assumed the operation of another railroad in excess of its granted powers, does not relieve it from liability to a passenger for personal injuries sustained on the leased line.

5. While a corporation is an artificial person in law, having an entity distinct from that of its stockholders, that doctrine will not necessarily bar an inquiry whether the nominal corporation is not merely a pretense behind which its officers and stockholders seek to perpetrate frauds and work wrongs without remedy.

6. Whether a lease of railroad property was made in good faith as a business transaction, or was a transaction upon paper designed to accomplish some ulterior purpose, is a question for the jury, where the same officers thereafter remain in control of the road, which was advertised and operated as before, and where after a time the lessee company was no more heard of.

7. The question of the negligence of a defendant railroad company

is for the jury, where one of the wheels of a car broke down while the train was running at a very rapid speed, causing its derailment, on account of which the plaintiff sustained personal injuries.

8. A release executed by one who sustained personal injuries in a railroad accident is void, when signed in reliance upon representations that it was merely a receipt for money then paid, where the party injured was at the time ill and suffering to such extent that it was a reasonable act upon her part to sign the paper without reading it.

9. The rule (if it be a rule) that one who seeks to avoid, on the ground of fraud, a release of a claim for personal injuries, must return the amount received under it, is satisfied by a tender of the money on the trial before the case is finally submitted to the jury.

10. In an action to recover damages for personal injuries, where a release is pleaded by the defendant, the admissibility of evidence to show that the release was obtained by fraud, which was not specially pleaded, can not be questioned for the first time on appeal.

No. 845. Submitted January 18, 1899. Decided February 21, 1899.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia upon the verdict of a jury, in an action to recover damages for a personal injury. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Leigh Robinson* for the appellant:

1. By no contract or arrangement, order, or direction can one railroad corporation be empowered to operate the railroad of another in the absence of legislative sanction. Without this sanction any contract by which a corporation seeks to accomplish such result is against public policy and void, and those who thereunder undertake to operate the road must be regarded as the agents of the corporation authorized by the legislature to do so. Save by legislative act, the powers and duties of one railroad corporation can not be assigned to another. *Oregon Co.* v. *Oregonian Co.,* 130 U. S. 1; *Thomas* v. *Railroad Co.,* 101 U. S. 83; *Penn. Co.* v. *Railway Co.,* 118 U. S. 309; *St. Louis Co.* v. *Railroad Co.,* 145 U. S. 393;

*Pittsburg Co.* v. *Bedford Co.*, 81 Pa. St. 104; *Railways* v. *Railway Co.*, 73 E. C. L. 810; *Gardner* v. *Railroad Co.*, L. R., 2 Ch. App. Cas. 211; *Railway Co.* v. *Morris*, 67 Tex. 699; *Railroad Co.* v. *Underwood*, 67 Tex. 589.

2. The lease of a railroad, when authorized by the legislature, effects a transfer to the lessee of the rights and liabilities in its management, whereby the corporation owning the railway is discharged from responsibility for the torts of the lessee. Pierce on Railroads, 283, note 6; 3 Wood's Rwy. Law, Sec. 489; *Hayes* v. *Railroad Co.*, 74 Fed. Rep. 279; *Arrowsmith* v. *Railroad Co.*, 57 Fed. Rep. 165; *Railroad Co.* v. *Curl*, 28 Kan. 444; *Nugent* v. *Railroad*, 80 Me. 76; *Railroad Co.* v. *Washington*, 86 Va. 365; Taylor on Corporations, Sec. 131; *Railroad Co.* v. *Ely*, 65 Pa. St. 205; *Gratey* v. *Railroad Co.*, 41 Pa. St. 447; *Mahoney* v. *Railroad Co.*, 63 Me. 68; Elliott on Railroads, Sec. 469; *Daniels* v. *Hart*, 118 Mass. 544.

3. The record shows conclusively that there was no grant of power to the E., L. & B. S. Co. to turn over the operation of its road to any company otherwise than by lease, and no grant of power to the C. & O. Rwy. Co. to assume the operation of any other railway than its own even by lease, and that no lease to the C. & O. Rwy. Co. was ever made; hence any contract to accomplish this object would have been a void contract, which neither party could enforce, but which there would have been a continuing duty upon both parties to terminate. The record conclusively shows that by a lease made with the sanction of the legislature the E., L. & B. S. RR. did turn over the operation of its road to the N. N. & M. V. Co., which was authorized to take it, and that the latter company was the only one which at the time of the accident to the female plaintiff had the right and power to operate the railway between Lexington and the Big Sandy, and therefore the only one made by law responsible for injuries to passengers thereon. *Ricketts* v. *Railway Co.*, 33 W. Va. 433.

4. The record shows that the C. & O. Rwy. Co. did not claim (as it did not have) the right or the power to operate the E., L. & B. S. Rwy., but, on the contrary, publicly disclaimed such right or power and any and all liability therefor. The record conclusively shows that prior to and at the time of the accident to the plaintiff the N. N. & M. V. Co. did claim, as it did have, the right and power to operate the E., L. & B. S. Rwy., and publicly proclaimed the same. *Railroad Co.* v. *Swartzenberger*, 45 Pa. St. 214; *Harton* v. *Railroad Co.*, 114 Mass. 47; 2 Redfield on Railways, Sec. 201; *Penn. Co.* v. *Connell*, 112 Ill. 303 ; *Milnor* v. *Railroad Co.*, 53 N. Y. 369 ; *Railroad Co.* v. *Manufacturing Co.*, 16 Wall. 324 ; *Myrick* v. *Railroad Co.*, 107 U. S. 107; 2 Beach on Railways, Sec. 1006 ; 2 Wood's Railway Law, Sec. 359 ; 29 Am. & Eng. Encyc. L., 1086.

The ticket, which the female plaintiff says she bought could not possibly have justified her claim against the C. & O. Rwy. had no lease ever been made to the N. N. & M. V. Co., and the mere division of the price of the through tickets between the connecting companies did not constitute a partnership which would render either company liable for injuries or losses occurring upon the other.

5. Traffic arrangements for continuous transportation by connecting lines, for a division of receipts from the through traffic, and for the employment of the same officials for the purpose of economy in administration do not affect the independence of each line. Where a community of profit and loss does not exist, no partnership exists. *Ellsworth* v. *Tartt*, 26 Ala. 733 ; *Irvin* v. *Nashville, etc., Co.*, 92 Ill. 103 ; *Watkins* v. *Terre Haute Co.*, 8 Mo. App. 569 ; *Insurance Co.* v. *Railroad Co.*, 104 U. S. 146 ; *Washington* v. *Railroad Co.*, 101 N. C. 239 ; *Croft* v. *Railroad Co.*, 1 MacA. 492 ; *Deming* v. *Railroad Co.*, 21 F. 25 ; *Union Pac. Co.* v. *Railway Co* , 163 U. S. 582; Green's Brice's Ultra Vires, 427.

6. The fact that one company is a stockholder in the company owning and operating a connecting line, does not

render it liable for losses or accidents occurring on such line, either on the theory that it controls such line or is a part owner. Still less does the fact that one member of a company is such stockholder in a connecting line, though he own a majority of the stock of the latter company, render the former liable for losses or injuries thereon. *Atchison Co.* v. *Cochran,* 43 Kans. 225; *Pullman Co.* v. *Mo. Pac. Co.,* 115 U. S. 596; *Railroad Co. Winans,* 17 How. 30.

7. The record shows conclusively that at the time of the accident to the female plaintiff, the C. & O. RR. Co., not only did not operate the E., L. & B. S. RR., but that it did not and could not operate any railroad, having, with the sanction of the States of Virginia and West Virginia, transferred all its right and power to do so to the N. N. & M. V. Company.

The State of Virginia ratified the lease made by the Chesapeake and Ohio Railway Company to the Newport News and Mississippi Valley Company of its railroad, property and rights, bearing date on the 15th day of June, 1886. The State could have authorized it in the first instance, and whatever it can do or direct to be done originally, it can subsequently, and when done, lawfully ratify and adopt with the same effect as though it had been properly done under a previous authority. *State* v. *Torinus,* 26 Minn. 5. It is an elementary maxim that the effect of a subsequent ratification is that it relates back and gives validity to the unauthorized act or contract as of the date when it was made. Story on Agency, Sec. 244; *Maclean* v. *Dunn,* 13 Encyc. L. 712; *Street* v. *United States,* 133 U. S. 307; *Grogan* v. *San Francisco,* 18 Cal. 591. The transfer of the franchise of a railroad corporation must have the "authority of the legislature, as shown by previous 'leave or subsequent ratification." *Daniel* v. *Hart,* 118 Mass. 544; *Thomas* v. *Railroad Co.,* 101 U. S. 85. One sanction is as effective as the other.

8. Failure to anticipate an improbable danger is not negligence. *Sjogren* v. *Hall,* 53 Mich. 277; 1 Addison on Torts, 3.

9. It was incompetent for the court to submit the question of fraud to the jury upon the evidence relied on for that purpose and in the absence of any allegation of fraud in the pleadings. *Lynn* v. *Railroad Co.*, 60 Md. 413; *Keyser* v. *Hitz*, 133 U. S. 149; *Andrus* v. *Smelting Co.*, 130 U. S. 647; *Mainlock* v. *Fairbanks*, 46 Wis. 417; *Rockafellow* v. *Baker*, 41 Pa. St. 321; *Hobbs* v. *Parker*, 31 Me. 143; *Slaughter's Admr.* v. *Gerson*, 13 Wall. 383–385; *Spitey* v. *Railroad Co.*, 75 Md. 171; *Hennessey* v. *Bacon*, 137 U. S. 85; *Cleaveland* v. *Richardson*, 132 U. S. 329. When fraud is not charged in the pleadings, it can not be considered at the trial. Not only was the question of fraud submitted to the jury without legal proof, but it was so submitted in the absence of any accusation, allegation, or issue under which it could be submitted at all. The jury was only sworn to try the issues joined between plaintiffs and defendants, and had not been sworn to try that which was not directly or indirectly one of those issues. *Very* v. *Levy*, 13 How. 345; *Patton* v. *Taylor*, 7 How. 375; *Hamilton* v. *Ross*, 23 Neb. 630; *Frankhouer* v. *Frankhouer*, 20 Ind. 62; *Irion* v. *Mills*, 41 Tex. 310; *Timms* v. *Shannon*, 19 Md. 296; *Wesley* v. *Thomas*, 6 H. & J. 24; *Turner* v. *Kellian*, 12 Neb. 581; *Bell* v. *Lamprey*, 52 N. H. 47; *Connor* v. *Dundee Chemical Works*, 50 N. J. L. 257.

A party is not permitted to set up that an instrument was procured by fraud, and at the same time retain the benefits received under it; nor is unreasonable delay permissible after alleged discovery of the fraud. *Day* v. *India Rubber Co.*, 20 How. 218; *Grymes* v. *Sanders*, 103 U. S. 61; *Hennessey* v. *Bacon*, 137 U. S. 78; 12 Am. & Eng. Encyc. L. 603; *Lyons* v. *Allen*, 11 App. D. C. 551.

*Mr. R. Ross Perry, Mr. James Francis Smith* and *Mr. R. Ross Perry, Jr.,* for the appellees:

1. Proof of the ratification by Virginia of the lease by the N. N. & M. V. Company to the appellant having been introduced, it is claimed by the appellant that the trial justice

was bound to instruct the jury that the legal effect of this lease was to discharge the appellant. The trial justice left it to the jury to say whether or not, upon all the evidence, the appellant was in fact operating the Kentucky road in question at the given time. There was no error in so doing. The leases have gained no validity by any proof introduced on the second trial of the cause.

The Act of the Legislature of Virginia was approved May 14, 1887, and provided that it should be in force from the day of its passage. A proviso, in the enacting clause itself, to its taking effect was that the Connecticut company should pay all taxes against the Virginia company in lawful money and not in coupons. No proof whatever was offered of a compliance with this proviso. As the proviso was in the enacting clause itself, the failure to make such proof was fatal. Dwarris on Statutes (Am. Ed.), 119. Moreover, it was especially provided that it should take effect from the date of its passage. It could not, therefore, relate back to November, 1886, so as to affect prior rights. Remedial statutes are not to be given a retroactive effect unless the legislative intent to this effect is clear. 23 Am. & Eng. Encyc. L. 448, and cases cited in note 4.

In West Virginia reliance is placed upon certain general provisions of law which must be construed as applicable only to foreign corporations validly organized. The Supreme Court of the United States has (130 U. S. 1) adverted to the slender support which can be gained from such *ex parte* and perfunctory proceedings. In Kentucky no legislative action is produced. Inasmuch as the accident occurred in this State, it would seem that the case remains in this respect as it was before. Upon the general subject of leases by public corporations, and their authorization by express language of their charters or by acts of the legislature, the following are controlling cases: *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Branch* v. *Jessup*, 106 U. S. 468; *Railroad* v. *Railway*, 118 U. S. 290; *Railway* v. *Railway*, 130 U. S. 1; *Transportation*

*Co.* v. *Car Co.*, 139 U. S. 24; *Railway Co.* v. *Railway Co.*, 145 U. S. 393; *Railway Co.* v. *Railroad Co.*, 163 U. S. 564.

Suppose, however, that these leases have a *prima facie* validity. Can it be claimed that they operate in law to cut off all inquiry into the fact as to what company operated the Kentucky road in November, 1886? The leases make express provision that both the Virginia and the Kentucky companies shall keep up their respective corporate organizations under the laws of the States of Virginia and Kentucky, and in fact parts of the annual rentals of $5,000 are explicitly applied to this purpose. There was nothing impossible in the continued operation of the Kentucky by the Virginia roads, notwithstanding the lease to the Connecticut company. *Railroad Co.* v. *Brown*, 17 Wall. 445; *Railroad Co.* v. *Jones*, 155 U. S. 333.

2. As to the effect of the release executed by Mrs. Howard. Upon the first trial of this cause it was determined as a matter of law that the alleged release was invalid to bar the rights of the plaintiffs. Upon the second trial evidence was submitted as to the circumstances under which the release in question was made. The instruction of the court upon this point is in exact accord with the opinion of the Supreme Court of the United States in *Railroad Co.* v. *Harris*, 158 U. S. 326. See, also, *Mullen* v. *Railroad Co.*, 127 Mass. 86.

This court, in *Lyons* v. *Allen*, 11 App. D. C. 543, decided that where a person executed a release intentionally, but induced thereto by fraudulent representations, he must restore the consideration received or put the other party *in statu quo* before he can avoid it. In that case the court relies upon *Drohan* v. *Railroad Co.*, 162 Mass. 435, which distinguishes the case of *Mullen* v. *Railroad Co., supra*. The distinction is the well-settled one between a case where a person is fraudulently led to do one thing supposing he is doing another, and a case where a person does what he intends to do but is led thereto by fraudulent inducements.

Bishop on Contracts, Secs. 645, 671. In the former case the contract is absolutely void, and it is not necessary to pay back any money received as a prerequisite to suit. Indeed, such payment would have been impossible in the present case, since Mrs. Howard testifies that she did not know this paper was alleged to be a release until after this suit had been brought. Further authorities in support of the appellees' position are: 20 Am. & Eng. Encyc. of L., 761–764, and cases cited; *O'Donnell* v. *Clinton*, 145 Mass. 461; *Smith* v. *Holyoke*, 112 Mass. 517; *Lusted* v. *Railroad Co.*, 71 Wis. 391; *Railroad Co.* v. *Lewis*, 109 Ill. 120.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This action was begun by Laura P. Howard and husband in the Supreme Court of the District of Columbia, on November 12, 1887, to recover damages for injuries received by her, as alleged, whilst being carried as a passenger on defendant's railway. The injury occurred at a station called Soldier in the State of Kentucky, on November 18, 1886.

The first trial below resulted in a judgment for the defendant, the Chesapeake and Ohio Railway Company, the jury having been charged to return a verdict because there was not sufficient evidence to show that the railway line on which the accident occurred was owned, managed, or operated by the defendant.

On appeal by Mrs. Howard, that judgment was reversed and the cause remanded for a new trial. 11 App. D. C. 300.

The second trial resulted in a judgment for the plaintiffs from which the defendant has appealed.

Two questions that were determined adversely to the defendant on the former appeal, namely, in respect of the jurisdiction, and of the plea of limitations to the amended declaration, will not be reconsidered.

Others will be, because it is claimed that by reason of the additional evidence introduced on the last trial they have been presented in a materially different light.

The evidence introduced on the first trial, all of which that is of importance was reintroduced on the second, is fully set out in the report of the case above referred to, and each additional. and material fact that the record discloses will be referred to in the discussion of the point upon which it bears, in the course of this opinion.

2. The first point to be considered is, whether there was sufficient evidence to justify the court in submitting to the jury the question, whether the defendant was engaged in the operation of the road of the Elizabethtown, Lexington and Big Sandy Railroad Company (called the Kentucky corporation) at the time of the accident?

This was one of the questions considered in the opinion on the former appeal, and it was then said:

"From the testimony, given exclusively by defendant's witnesses and set out in full in the preliminary statement, it appears that the road upon which the accident occurred had been built by the Elizabethtown, Lexington and Big Sandy Railroad Company, under a charter from the State of Kentucky, and is wholly within that State. That charter authorized it to make contracts with other corporations for the operation of its railway. The Chesapeake and Ohio Railway Company, under charter from the State of Virginia, built and operated a railway from Newport News to Huntington and Big Sandy, connecting with the line of the Elizabethtown, Lexington and Big Sandy Railway Company. Collis P. Huntington, who was the principal stockholder and the controlling spirit of each corporation, conceived a plan to bring under one management the foregoing railway lines and others into one great line of transportation. from the Atlantic to the Pacific. Beginning in 1882, trains were run over the two lines aforesaid, under the name of the Chesapeake and Ohio route, 'under an arrangement by which it was practically a continuous system.' 'The properties were then operated together by one general manager, Mr. C. W. Smith, under the verbal directions of Mr. C. P. Huntington.'

The terms of this 'arrangement' are not given; but it appears that the defendant's officers maintained the railway of the Kentucky corporation and kept an account of all receipts and disbursements on account of the latter. From the terms of the 'arrangement' as stated, and the nature of the proceedings thereunder, we think it clear that the defendant became responsible for the safe carriage of passengers over the railway of the Kentucky corporation. *P. RR. Co.* v. *Jones,* 155 U. S. 333; *Sun Ins. Co.* v. *Kountz Line,* 122 U. S. 583. The condition of a contract, therefore, confining defendant's liability to its own line must necessarily be limited in its operation to such other connecting lines only as may have remained under their own separate and independent management. This 'arrangement' or contract for the operation of one line by the other was to extend to the latter part of the year 1887, or about one year later than the date of the injury to Mrs. Howard. It follows, therefore, that if nothing had occurred in the meantime to change the arrangement aforesaid, the condition of the ticket would not prevent recovery in this action if the injuries received by Mrs. Howard were caused by the carrier's negligence."

In addition to the evidence on this point summarized above, the plaintiff read a deposition of J. D. Yarrington that had been taken on behalf of the defendant. The witness resided near Lexington, Kentucky, the eastern terminus of the Kentucky corporation, and said that in November, 1886, he was superintendent thereon "of the division operated at the time, I believe, by the Chesapeake and Ohio Railway Company." He was then asked this question by defendants' representative in taking the deposition: "Do you mean to say that it was then being operated by the Chesapeake and Ohio Railway Company, or the N. N. & M. V. Co.? If you can not state positively, give your best impression." He answered: "I am not clear as to which."

H. W. Fuller, who had been from 1883 to 1886 general passenger agent of the defendant and had followed into the

service of the lessee of that company in 1886, then into that of the receiver appointed for both lessor and lessee in October, 1887, and finally back into that of the defendant upon the return of its railway to its own possession some time after, in the same capacity, was introduced as a witness, first by the plaintiff and afterwards by the defendant on the last trial.

It would occupy considerable time to review this evidence at length, and we think it sufficient to say, after its careful examination, that it does not materially alter the substance of his former deposition.

We are, therefore, of the same opinion as before, that the evidence was properly submitted to the jury.

3. The next point is, the legal effect of the lease of the defendant's railway, in June, 1886, to the Newport News and Mississippi Valley Company (called the Connecticut corporation), upon the defendant's liability, for the injury received by the plaintiff in November, 1886.

Referring to the same contention on the former appeal, that the lease had necessarily terminated the "arrangement" by virtue of which the defendant had operated the railroad of the Kentucky corporation, it was then said:

" The chief point of defendant's contention is that the arrangement had come to an end prior to the accident, in so far as defendant was concerned, by the lease of its line to the Newport News and Mississippi Valley Company. The evidence in support of this contention shows that in January and June, 1886, respectively, the defendant and the Elizabethtown, Lexington and Big Sandy Railway Company had entered into contracts with the Newport News and Mississippi Valley Company for the lease of their lines for 250 years, upon an annual rental of $5,000. Collis P. Huntington signed the defendant's lease for each company as president. Though not president of the Kentucky corporation, he controlled it absolutely. This was all done in

14 Ct. App.—19

execution of his plan for a great Atlantic and Pacific rail-
way system.   Referring to the arrangement aforesaid, under
which the defendant operated the two lines of railway, the
witness said: 'The organization of the Newport News and
Misssissippi Valley Company terminated the contract, I
suppose, by force of the arrangement then made.   It was
terminated in the same manner it was made, by direction
of Mr. Huntington; Mr. Huntington directed Mr. Smith to
operate the properties, as I have indicated, and upon the
formation of the Newport News and Mississippi Valley Com-
pany and the execution of the leases, he directed the opera-
tion of the line to be had in accordance with these leases.'
This general lessee corporation was incorporated by the
legislature of the State of Connecticut, March 27, 1884, un-
der the name of the Southern Pacific Company, which was
changed by an amendatory act, March 10, 1885, to that of
the Newport News and Mississippi Valley Company.   This
act of incorporation is not set out in the record, and it does
not appear what express powers it was authorized to exer-
cise outside the limits of that State.   One clause is given,
however, which expressly forbids the power to 'make joint
stock with, own, hold, or operate any railroad in the State
of Connecticut.'"

It was then further said: " There is nothing in the record
to show that the State of Virginia ever authorized the lease
by defendant of its railway.   Nor does it appear that the
existence of the Newport News and Mississippi Valley Com-
pany had ever been recognized by that State, or the State
of Kentucky, much less the power conferred upon it to lease
and operate a railway therein."

It was then held that in the absence of the express
authority of the State, the lease was void and had no effect
upon the liability of the defendant for the acts of its pre-
tended lessee in operating the road.   It was also held that
this Connecticut corporation, no matter what express pow-
ers it might have been authorized to exercise outside of that

State, had, by the express prohibition of the exercise of those powers therein, been discredited and practically expelled from its domicile; and that other States were not bound by any kind of courtesy or comity to treat it with more consideration than its creator had done. In that connection, however, it was said: "Had this corporation been recognized in the exercise of these powers by the Court of Appeals of Virginia, we would feel bound to follow its decision and give effect to the lease within the limits of that State."

On the last trial, the defendant undertook to prove by certain acts of the legislatures of Virginia and West Virginia, regularly introduced in evidence, and by certain decisions of the courts of last resort in those States, the grant of the power, and its complete recognition, to make the lease aforesaid by the defendant to the Connecticut corporation.

These acts are here cited as they appear in the record:

(1) "Chap. 219. An act to ratify and confirm the lease of the Chesapeake and Ohio Railway to the Newport News and Mississippi Valley Company,'approved May 14th, 1887.

"1. Be it enacted by the General Assembly of Virginia, That the lease made by the Chesapeake and Ohio Railway Company to the Newport News and Mississippi Valley Company, of its railroad, property and rights, bearing date on the 15th day of June, eighteen hundred and eighty-six, be and the same is hereby ratified and confirmed: Provided, however, that the said Newport News and Mississippi Valley Company shall pay all taxes assessed upon its property, or the property of the Chesapeake and Ohio Railway Company in lawful money and not in coupons.

"2. This act shall be in force from its passage."

(2) "A duly certified copy of Section 53 of Chapter 54 of the Code of West Virginia, as the same was enacted February 5, 1883, and remained in effect unamended until February 22, 1889, attested March 28, 1898, by the Secretary

of State of West Virginia, with the great seal of the State affixed thereto; so much of which as is relevant to this case being as follows:

"No railroad corporation owning or operating a railroad wholly or in part within this State shall consolidate its capital stock with any other railroad running a parallel or competing line without the consent of the legislature; but any such railroad corporation, whose line of railroad is made, or is in process of construction, may merge, or consolidate with, or lease its railroad, or any part thereof, for a term of years, to any other corporation owning or operating any connecting line of railroad, whose line of road is completed, or is in process of construction, wholly or partly within this or an adjoining State, in order to make a continuous line of railroad, to be run and operated with or without changes of cars or break of bulk or exchange or transfer of passengers or freight."

A duly authenticated copy of another act passed on the 18th day of March, 1882, and in force November 16, 1886, amending and re-enacting various sections of Chapter 24 of the Code of West Virginia, as follows:

"30. Any corporation duly incorporated by the laws of any State or Territory of the United States or of the District of Columbia, or of any foreign country, may, unless it be otherwise expressly provided, hold property and transact business in this State, upon complying with the requirements of this section, and not otherwise. Such corporation so complying shall have the same rights, powers and privileges and be subject to the same regulations, restrictions and liabilities that are conferred and imposed by this and the fifty-second and fifty-third chapters of this code on corporations chartered under the laws of this State. Every such corporation shall file with the secretary of state a copy of its articles of association, and of the law or authority under which it is incorporated. The secretary of state shall issue to every such corporation complying with the provisions of

this section a certificate of the fact of its having done so, which certificate shall be filed and recorded in the clerk's office of the county court of the county, or one of the counties, in which its business is conducted. Such corporation shall also file in said clerk's office a copy of its charter, to be kept and preserved therein. Every railroad corporation doing business in this State under the provisions of this section, or under charters granted or laws passed by the State of Virginia or this State, is hereby declared to be as to its works, property, operations, transactions and business in this State, a domestic corporation, and shall be so held and treated in all suits and legal proceedings which may be commenced or carried on by or against any such railroad corporation, as well as in all other matters relating to such corporation. No railroad corporation which has a charter or any corporate authority from any other State shall do business in this State as the lessee of the works, property or franchises of any other corporation or persons, or otherwise, or bring or maintain any action, suit or proceeding in this State until it shall in addition to what is hereinbefore required, file in the office of the secretary of state a writing duly executed under its corporate seal accepting the provisions of this section and agreeing to be governed thereby; and its failures so to do, may be pleaded in abatement of any such action, suit or proceeding, but nothing herein contained shall be construed to lessen the liability of any corporation which may not have complied with the requirements of this section, upon any contract or for any wrong."

(3) The defendant, by its counsel, then offered and read in evidence the duly authenticated copy or copies of the articles of association of the Newport News and Mississippi Valley Company, and the law and authority under which said company was incorporated, as the said articles and authority are of record in the office of the secretary of state of West Virginia, being, first, the act of the General Assembly of Connecticut approved March 27, 1884, incorporating

the Southern Pacific Company, with the grant of power to buy, lease, operate railroads in any State or Territory of the United States or in any foreign country, heretofore mentioned and described in Exhibit H. T. W. No. 7 to the deposition of H. T. Wickham, fixing the capital stock of said corporation at $1,000,000, divided into shares of $100 each, and providing that whenever $500,000 shall be subscribed and 10 per cent. of said subscription shall be paid in cash the stockholders of said corporation may organize the same, and said corporation may proceed to do business; second, the affidavit of I. E. Gates, secretary of the Southern Pacific Company, showing the acceptance of said charter by the vote of the majority of the corporation and the subscription of $500,000 of the capital stock of said company on the 10th day of May, 1884, and the payment in cash of 10 per cent. of such subscriptions at the time of subscription, the organization, adoption of by-laws, and election of board of directors of said corporation; third, the act or resolution of the Connecticut Legislature approved March 19, 1885, changing the name of the Southern Pacific to the Newport News and Mississippi Valley Company, with the powers and privileges and subject to the liabilities belonging to or incurred by the company under its former name, as if said change had not been made, each and every one of the foregoing papers being accompanied by the certificate of the secretary of state of Connecticut that the same is a correct copy of the record of file in his office.

Next the copy or copies of the same articles of association and law and authority of incorporation of the Newport News and Mississippi Valley Company, as the same are of record in the clerk's office of the county court of Kanawha County, West Virginia, with the certificate of the clerk of said court, duly authenticated according to Federal law, that the same is a true copy of the record in his office.

(4) There was next offered the certificate of the Secretary of State of West Virginia, under date of July 27, 1886, in

the usual form, showing the filing of the charter in compliance with the law.

(5) And next the duly authenticated copy of the acceptance of the Newport News and Mississippi Valley Company of the provisions of the Code of West Virginia, and agreement to be governed thereby, in words and figures as follows:

" The Newport News and Mississippi Valley Company, a corporation created, organized, and existing under and by virtue of an act or joint resolution of the General Assembly of the State of Connecticut, passed at its January session, A. D. 1884, and approved March 27th, 1884, a copy of which is herewith filed, and under and by virtue of a subsequent act or joint resolution, passed by the General Assembly of said State at its January session, A. .D. 1885, approved March 19th, 1885, a copy of which is also herewith filed; desiring to do business as such corporation in the State of West Virginia, as lessee of the works, property and franchises of the Chesapeake and Ohio Railway Company, hereby accept the provisions of section 30, of chapter 54 of the Code of West Virginia, and agrees to be governed thereby.

" In witness whereof, the said Newport News and Mississippi Valley Company, has caused its corporate seal to be hereto affixed, and this instrument of writing to be signed on its behalf, by its president, and attested by its secretary, this 21st day of July, 1886.

                              "NEWPORT NEWS AND MISSISSIPPI ·
[SEAL]                   VALLEY CO.,
                    "By C. P. HUNTINGTON, *President.*

"Attest: I. E. GATES, *Secretary.*"

(6) The decisions of the courts of said States claimed as recognizing the authority of the Newport News and Mississipi Valley Company, will be mentioned later.

The act of the General Assembly of Virginia was not enacted until after plaintiff's right of action against the

defendant had accrued. Whether that act, which took effect from its passage, was intended to operate prospectively only and not to affect intervening rights, as has been argued, need not be considered.

Granting that it was intended to be retrospective, as well as that it completely precludes the State from action in respect to the previous illegality of that lease, it can not take away the right of the plaintiff that had become vested during the intervening time. *Webster* v. *Cooper*, 14 How. 488, 501; *Cook* v. *Tullis*, 18 Wall. 332, 338; *Pickering* v. *Lomax*, 145 U. S. 310, 315; *Morley* v. *Lake Shore etc., Rwy. Co.*, 146 U. S. 162, 168; 1 Am. & Eng. Encyc. L. (2d Ed.), 1215.

We will now consider the status of the Connecticut corporation, as lessee of the part of defendant's road situated in the State of West Virginia, under section 53 of chapter 54 of the code of that State, and its acceptance of the provisions of section 30, chapter 24, hereinabove set out.

It will be observed that section 53 limits its permission to railroads, wholly or in part within said State, to merge, consolidate with, or lease their railroads, or any part thereof, "to corporations owning or operating any connecting line of railroad, whose line of railroad is completed, or is in process of construction wholly or partly within this or an adjoining State." Now, it clearly appears from the evidence that the Connecticut corporation, at the time of the accrual of plaintiff's right of action, had not built, or undertaken to build, a railroad anywhere; and that it has not constructed one, either wholly or in part, since. Nor was it at the time, as we have heretofore held, lawfully operating the connecting line of this defendant in the State of Virginia. The same may be said of the connecting line in the State of Kentucky, for no attempt has been made to show the existence of any statutory authority of that State for its control or operation by the Connecticut corporation. In using the words "operating any connecting line of railroad," we must presume that the legislature of West Virginia meant a *bona fide* operation

under the authority of a lawful contract therefor, and nothing less.

Now, in contemplation of law, both of these connecting lines in Virginia and Kentucky, respectively, were being operated, at the time, by their lawful owners, notwithstanding the immediate and active, but unauthorized and unconfirmed agency of the Connecticut corporation therein.

The permission received by the Connecticut corporation to do business in West Virginia, through compliance with the provisions of section 30, chapter 24, aforesaid, could not confer upon it the power to take a lease of defendant's railway in that State.   The prohibition of section 53, above recited, still applied; for if there be any inconsistency between the two sections that would prevent their standing in force together, it is section 30 that must give way, because the other was last enacted.

That the Connecticut corporation, in accepting the provisions of section 30 expressly declared its desire to do business in the State "as lessee of the works, property and franchises of the Chesapeake and Ohio Railway Company," and that the secretary of state by accepting the same and issuing the usual formal certificate may have assented thereto, are facts entitled to no weight whatever.   That officer had no authority to bind the State to a greater extent than that expressly conferred upon him by law.   And had the parties behind the Connecticut corporation taken out a regular charter under this general incorporation act, with an express declaration of powers more comprehensive still, its provisions would have no effect in law when not in harmony with the public policy of the State as shown in the general body of its laws.   *Oregon Rwy. & Nav. Co.* v. *Oregonian Rwy. Co. Limited,* 130 U. S. 1, 24, 26.

In this connection it will not be irrelevant to state certain facts in respect of the incorporation of the Chesapeake and Ohio Railway Company, and the character of the lease made in its name to the Connecticut corporation.

Apparently its original incorporation was by the State of Virginia, and it afterwards had standing in West Virginia as a corporation, and was treated as a corporation of that State. Whether the members of the Virginia corporation organized another corporation under the same name in West Virginia, under express enactment of the legislature, or whether the Virginia corporation, as already organized, was licensed or permitted to extend its railway into and through the State, and given standing as a domestic corporation for general purposes, does not appear. Either might have been lawfully done. *St. L. & S. F. RR. Co.* v. *James,* 161 U. S. 545, 561, 562. Whatever the fact may be, it evidently acted as one corporation, with but one set of officers and one management; all of which it might lawfully have done, in either case, by the express permission of the State of West Virginia. *Graham* v. *Boston, etc., RR. Co.,* 118 U. S. 161, 169; *St. L. & S. F. RR. Co.* v. *James,* 161 U. S. *ante.*

The lease of June 15, 1886, recites that it is made by the "Chesapeake and Ohio Railway Company, a corporation existing under the laws of the States of Virginia and West Virginia, party of the first part."

The yearly rental of $5,000 is required to be "applied by the party of the first part to the expense of maintaining and keeping up its corporate organization under the laws of the States of Virginia and West Virginia." The road leased is that "now owned and operated by the party of the first part," with all branches, sidings, etc.—in detail, all property of every nature whatsoever—"extending from Phebus in the State of Virginia to Huntington in the State of West Virginia," including the rights under agreement with the Kentucky corporation on the line between Huntington and Big Sandy. The execution of this lease shows—Chesapeake and Ohio Railway Company, by C. P. Huntington, president; and Newport News and Mississippi Valley Company, by C. P. Huntington, president. There was no separate

lease of the West Virginia part of the railway, and no provision for its separate operation in that State. Executed by the one corporation, and indivisible in its terms, it was wholly void until ratified, as we have seen, by the State of Virginia.

4. Based upon the conclusion that there was no grant of power under which the Chesapeake and Ohio Railway Company of Virginia and West Virginia could lease, or assume the operation of, the railway of the Kentucky corporation, it is contended that it can not be held liable for an injury done thereon in the execution of this *ultra vires* and prohibited power.

It does not follow, however, that because the Kentucky corporation, if sued, could not have escaped liability by reason of its unlawful surrender of its road to the control of the defendant, that the latter can escape liability for its own torts committed during such unauthorized control. A corporation may have the capacity to do a wrong, without, at the same time, having the power to engage in the business wherein that wrong shall have been committed. There must necessarily be a difference between the capacity of a corporation to commit a wrong and its capacity to make a contract in excess of its granted powers. Parties who contract with it are under no compulsion, and have every opportunity in fact, besides being presumed in law, to know the scope of its powers. Where a tort is committed, the injured person is brought into relations with the corporation against his will. He has been put upon no inquiry, occupies a situation imposed upon him, and has no reasonable opportunity to protect himself.

Public policy, looking to the necessary protection of life and property, demands that liability for torts, committed by corporate agents under the direct authority of the corporation, be made an exception to the general rule in respect of acts *ultra vires*. In this instance the act was that of the defendant, and though done without lawful authority, it can

not escape liability therefor.   Whatever may be the conflict of authority elsewhere, the doctrine has been firmly established by the Supreme Court of the United States that "corporations are liable for every wrong they commit and in such cases the doctrine of *ultra vires* has no application." *National Bank* v. *Graham*, 100 U. S. 699, 702; *Salt Lake City* v. *Hollister*, 118 U. S. 256, 260;  *D. & R. G. RR. Co.* v. *Harris*, 122 U. S. 597, 608;  *Lake S. etc. RR. Co.* v. *Prentice*, 147 U. S. 101, 109.   See, also, *Bissell* v. *Railroad Co.*, 22 N. Y. 298; *Buffett* v. *Railroad Co.*, 40 N. Y. 298;  *Nims* v. *School District*, 160 Mass. 177;  *Hutchinson* v. *W. & A. RR. Co.*, 6 Hieskell, 634;  *N. Y., L. E. & W. RR. Co.* v. *Haring*, 47 N. J. L. 137; *C. R. & B. Co.* v. *Smith*, 76 Ala. 572.

The decisions of the courts of Virginia and West Virginia, cited by counsel for defendant as showing a recognition of the lease by the defendant to the Connecticut corporation, amount to nothing more, practically, than an affirmation of the foregoing doctrine.   See *Stewart's Admr.* v. *N. N. & M. V. Co.*, 86 Va. 988;  *Bullington* v. *N. N. & M. V. Co.*, 32 W. Va. 436;  *Humphreys* v. *N. N. & M. V. CO.*, 33 W. Va. 135.   In no one of these was the validity of the lease involved. Besides section 30, Chap. 24 of the code, or statutes of West Virginia declares that a failure to comply with its provisions shall not lesson the liability of the corporation "upon any contract, or for any wrong."   See, also, *Ricketts* v. *C. & O. Rwy. Co.*, 33 W. Va. 433, where the defendant was held liable for an injury to a passenger on the Kentucky division in 1885.   In another case cited (*Rece* v. *N. N. & M. V. Co.*, 32 W. Va. 164), the only question involved was the right of the Connecticut corporation to remove a cause to the United States court.   Its right to do business as a corporation in West Virginia, simply, was secured by its filing its foreign charter and acceptance of the provisions of the law of that State; but this, as we have seen, did not confer the power to lease the defendant's railway, and that question did not arise in the case.

5. After charging the jury that the plaintiff could not recover against the defendant by reason merely of the ticket that had been sold by it, and that to entitle her to a verdict it must be found from the evidence that the defendant, at the time of her injury upon the Kentucky road, controlled the same, operated it and ran trains upon it, manned by its employees and controlled by its officers and agents, the court proceeded, under objection of the defendant, to charge the jury in respect of the effect of the lease by defendant to the Connecticut corporation as follows:

"But if you find from the evidence that the Chesapeake and Ohio Railroad Company, immediately before the execution of this lease just mentioned, was operating and controlling this Elizabethtown road, then you would naturally pass to the next step, which is, whether the execution of this lease and the facts and circumstances attendant upon it ended that arrangement, so that the Chesapeake and Ohio Railroad Company ceased at the time of the execution of that lease to control and run the trains upon that road?

"In considering this last question it is proper for you to consider also the lease which was made by the Chesapeake and Ohio Railroad of its own road to this Newport News and Mississippi Valley road. There is a lease in evidence here, dated, I think, the first of July or thereabouts, made by the Chesapeake and Ohio Railroad itself to the Newport News and Mississippi Valley road, and it is claimed by the defendant that after the execution of this last lease the whole line, not only the Elizabethtown road, but the Chesapeake and Ohio itself, was controlled and run by this Newport News and Mississippi Valley road, and that the Chesapeake and Ohio had no further agency or control in the running of either of those roads; and that is the question for you to determine, whether, at the time of the execution of those leases the Chesapeake and Ohio Railroad Company abandoned that business and turned it over to this new company, and this new company ran the trains on

those roads after that time and was running them at the time of this accident? The plaintiffs contend that that was simply a formal matter; that this Newport News and Mississippi Valley Company was a mere corporation on paper, so to speak, and that there was no actual delivery of possession of the roads or stock of this new company; that the same officers and agents and men who had controlled and done business before did it subsequently, and that it was really the Chesapeake and Ohio Railroad Company doing this same business under the name of the Newport News and Mississippi Valley road; and that is the question for you to determine really, the question whether that transaction was one in good faith as a business transaction or whether it was a transaction upon paper, to accomplish some ulterior purpose of the parties who engaged in it.

"You have heard all the evidence upon the question. It is proper for you to take into consideration not only the course of business there and what was done prior to the execution of those leases, but also what was done afterwards; what became of the Chesapeake and Ohio Railroad Company after the execution of these leases; what, if anything, it did; whether it ever resumed business, and how it and its officers treated this lease. That is all competent for you to consider. But the question finally resolves itself into the one I have tried to make plain to you, and that is whether at the time of this accident the Chesapeake and Railroad Company was the efficient agent which ran and controlled the trains that ran over the Elizabethtown, Lexington and Big Sandy Railroad. If so, they are liable for any negligence that occurred on that train; if not, they are not liable."

This instruction, we think, is in accord with the opinion expressed on the former appeal.

On this trial it was shown that the Connecticut corporation, discredited and exiled by the State that had authorized its organization, had not been recognized by the State

of Virginia, where the original and chief incorporation of the defendant had been had. There was nothing to show that it had ever really organized under the act of incorporation beyond the affidavit of one I. E. Gates, claiming to be its secretary; that was filed with the acceptance of the provisions of the laws of West Virginia in the office of the secretary of state of that commonwealth, to the effect that the $500,000 of authorized capital stock had been subscribed, 10 per cent. thereof paid in, and a board of directors elected.

This may have entitled it to recognition in West Virginia as a *de facto* corporation for the purposes required and permitted by its general incorporation laws; but is not proof of its organization in this case. It has been shown that it built and owned no road, and had no rolling stock. Collis P. Huntington as its president and as president of the defendant corporation and as the absolute controller of the Kentucky corporation, ran the railways of the latter as one line, and executed the agreements and leases that were offered in evidence to carry out certain plans of his own. As a creditor of the defendant, of which he was president, he subsequently caused a receiver of its property to be appointed, and when that proceeding ended, without foreclosure or sale, the defendant resumed control and operation of the roads in Virginia, West Virginia and Kentucky, and has maintained the same ever since. The lease that it had made to the Connecticut corporation, for two hundred and fifty years, and that had been ratified in the meantime by the State of Virginia, suddenly ended, in some manner wholly unexplained and apparently inexplicable save upon the theory propounded in the charge, that it was a "transaction upon paper to accomplish some ulterior purpose of the parties who engaged in it," and the Connecticut corporation disappeared from sight.

The general officers of the defendant, after the said lease

was executed, remained in the same positions in obedience
to the orders of the same person as President, C. P. Hunt-
ington; the trains ran as before; the route was advertised
as that of the Chesapeake and Ohio railway and Chesapeake
and Ohio route; the letter heads used by the general solici-
tor of the lessee in New York, who had also been general
solicitor for the defendant, in some correspondence concern-
ing this case, were those of the defendant; a physician em-
ployed to examine the plaintiff understood that he was
employed by the Chesapeake and Ohio Railway Company,
although the check for his services was signed by the Con-
necticut corporation; the superintendent of the division on
which the accident occurred believed that it was operated
at the time by the Chesapeake and Ohio Railway Company;
and the ticket, upon which the plaintiff traveled, had been
printed by the defendant, issued in its name and recognized
as valid on the entire route.   It contained nothing referring
to the Connecticut corporation, much less recognizing its
nominal control, even by lease or otherwise.

Lastly, the release obtained from the plaintiff, six days
after the accident, was a printed form providing not only
for the discharge of all claims against it, but also against
"their lessors or predecessor companies."

With evidence of these facts, and others that have been
before referred to, we think it was not error to submit to the
jury the question: "Whether that transaction was one in
good faith as a business transaction, or whether it was a
transaction upon paper to accomplish some ulterior purpose
of the parties who engaged in it?"

Whilst a corporation is an artificial person in law, having
an individuality or entity separate and distinct from that
of its stockholders, that doctrine, so well established and so
necessary to the legitimate ends for which corporations are
created and permitted to exist, will not necessarily bar an
inquiry into the fact whether the nominal corporation is
merely a pretense that has been raised for the sole purpose

of acting as a mask behind which so-called stockholders and officers may, with impunity, perpetrate frauds upon the public and the courts and work wrongs, without remedy, upon individuals. *Lehigh Mining & Mfg. Co.* v. *Kelly*, 160 U. S. 327, 329; *Montgomery* v. *Forbes*, 148 Mass. 249.

It may be remarked, however, of the foregoing charge, that it was given upon the assumption that the leases offered in evidence were *prima facie* valid, under the legislative authority that had been offered in evidence. As they have been held to be invalid, the verdict of the jury to the effect that the defendant was at the time of the injury actually operating the road and the train upon which it occurred, could not have been materially affected by this charge even if it had been erroneous.

6. The next question is on the error of the court, as assigned, in submitting the question of negligence, as the cause of the injury, to the jury upon the evidence introduced.

The charge upon this branch of the case is here given:

"If the jury find from the evidence that the accident to the train on which the plaintiff was traveling resulted from a latent or obscure defect or flaw in the flange of a wheel on the Piedmont Air Line coach which careful inspection could not have discovered before the accident, they are instructed that the plaintiff can not recover in this action, even if the train on which the accident occurred were that of the defendant.

"That is, if the accident happened from that broken flange and the liability of that flange to break could not have been discovered by the use or reasonable inspection prior to the accident, then it is what the law would treat as an accident that could not have been prevented, and nobody is liable for it.

"But if the accident happened from a broken flange and that break or flaw or weakness, if there was any in the flange or wheel, could and would have been discovered by the use

14 Ct. App.—20

of reasonable care in inspecting and testing the wheel before the accident, and the company failed to use that care or make that inspection, then there was negligence, and the defendant would be liable if you find the other points in favor of the plaintiffs. Or if the evidence shows to your satisfaction, by a preponderance of it, that the accident happened in some other way, from some other defect, too rapid running over the particular point where they were running, or any other negligence or carelessness of the parties running the train, the defendant would be liable."

To the last sentence of the foregoing an exception was taken by the defendant.

We think there was evidence which required the court to submit the question of negligence to the jury. In the first place, there is the presumption of negligence arising from the breaking down of the wheel of one of the cars in the train. *Weaver* v. *B. & O. RR. Co.*, 3 App. D. C. 436, 452; and cases therein cited.

Then there was evidence by one witness tending to show that the car had gotten off the track after leaving Louisville and before getting out of the yard, and that something was the matter with the spring. He said he heard this explanation. No objection was made to it as hearsay, and presumably it was admissible as part of the *res gestæ*.

Another witness, a civil engineer of the railway company, was a passenger upon the same train and testified concerning the accident and its cause. He stated it as his impression that the accident was caused by the first truck of the second smoker leaving the rails on account of reckless running, "and the broken spring in the car just preceding it had also a part in the cause."

The first witness also testified to the very rapid speed of the train immediately before and at the time of the derailment.

7. The last question to be considered arises on the pleading, evidence and charge of the court in respect of the

instrument executed by Mrs. Howard releasing the Newport News and Mississippi Valley Company and its "lessors or predecessor companies," in consideration of $200, from all liability on account of the injuries that she had received.

When this case was before us on the former appeal, there was no evidence of the laws in force in respect of the separate rights of married women, either in Kentucky, the place of injury, or Indiana, the domicile of the husband of Mrs. Howard. Mrs. Howard was, herself, living temporarily in the District of Columbia and engaged as a clerk in the Department of Agriculture.

It was then held, following (with the expression of some doubt) the decision in *Snashall* v. *Railway Co.*, 19 D. C. 407, 411, that the right of action for personal injuries received by the wife was not her sole, separate property under the Married Woman's Act of Congress then in force in this District, and unamended, and hence could not be discharged by her alone.

Upon the last trial, defendant offered evidence of the laws in force, at the date of the accident and the release, in the States of Indiana and Kentucky respectively, as follows:

Revised Statutes of Indiana:

"Sec. 5130. A married woman may carry on any trade or business and perform any labor or service on her sole and separate account. The earnings and profits of any married woman, accruing from her trade, business, service or labor, other than labor for her husband, or family, shall be her sole and separate property.

"Sec. 5131. A married woman may bring and maintain an action in her own name against any person or body corporate for damages for any injury to her person or character, the same as if she were sole; and the money recovered shall be her separate property, and her husband, in such case, shall not be liable for costs."

Act of the General Assembly of Kentucky:

"Sec. 1. That the wages and compensation of married

women, for service and labor done and performed by them, shall be free from the debts and control of their husbands; and their employers are allowed to pay such wages and compensation directly to such married women, and payment to them shall be a full discharge and acquittance of the employer."

Plaintiff then offered evidence tending to show that deception had been practiced upon her in obtaining her signature to the release.

Before stating this, it is not irrelevant to state the facts concerning the character of Mrs. Howard's injuries, as testified to by Doctor Chrystie, a New York specialist in spinal diseases. He said that—

"Mrs. Howard placed herself under his treatment early in 1887, and has been under his treatment ever since. She is suffering from an incurable spinal affection which is progressive, occasioning great suffering and almost total disability. During the first part of his treatment she was in New York under his care for the greater part of the time. During the subsequent years, she came there about once or twice a year. Witness had contrived and made for her an apparatus grasping the hip and extending up to the shoulders and giving support in front, which steadies the back as a broken bone would be steadied, and gives her partial relief; but the disease is located so low down, so much superincumbence of weight from above, that it does not give her complete relief. It is made of steel, and should be worn constantly. She should sleep in it. It is necessary for her to wear it for her comfort as well as for the protection of her backbone. The disease has progressed slowly. If it had not been for this spinal assistant I think she would have had complete paralysis."

She had been seen and examined by the surgeon of the railway company on the day of her injury, and had come east as far as Clifton Forge under his charge. She said that

she was first called upon in Washington at the house of Mrs. Warder by an agent of the railway company, who enquired of her injuries; that she was very sick and hardly able to talk, and he told her he would send the surgeon.  On the 24th of November, 1886, the surgeon came to see her, paid her $200, and obtained the execution of the release.  The room was very dark when he came, and she was alone and suffering.  He told her the company had sent her $200 to take care of her until she got up.  She said to him that she felt badly and was afraid she would lose her position.  He said, if you do, we will see you through.  He did not read to her the release, nor did she read it.  She was too ill to read it herself.  He told her the paper was a receipt for money to tide her through, and she signed it, not knowing that it was a release, but supposing it to be, as represented, a receipt for money given to help her.

It is fair to say that the surgeon, who testified in the case, stated that he came to see Mrs. Howard and settle with her, at the request of the general solicitor of the company, because he had become acquainted with her; that he saw her in a room with ordinary light; that he told her he was there as the representative of the railway company to try and make good, as far as they could see, her loss of time as a clerk; that he read the paper to her, and upon her expression of willingness to accept the $200, paid her that sum, and obtained her signature.  He signed his own name as a witness.  He further said that there was an elderly woman in the room at the time.  Mrs. Warder, at whose house this occurred, stated that she showed the surgeon to the room, left him there with Mrs. Howard alone, and did not return.

The foregoing evidence on the part of the plaintiff was offered without objection or exception, but it is now contended that it was error to submit the question of fraud raised thereby to the jury, because there was no allegation of fraud in the pleadings.  It appears from the pleadings

that the plaintiff merely joined issue on the plea setting up the said discharge.

The release might have been proved by defendant under the general issue, without a special plea. *Brown* v. *B. & O. RR. Co.*, 6 App. D. C. 237, 242. But whether, without amendment replying to the special plea, the evidence might have been admitted, it is not now necessary to inquire. The objection comes too late, when raised for the first time on appeal. Had it been made at the time the plaintiff would, doubtless, have cured the defect. *Washington Gas Light Co.* v. *Poore*, 3 App. D. C. 127, 135; *DeForest* v. *United States*, 11 App. D. C. 458, 460.

The charge to the jury, founded on this evidence, is in the following words:

"If you shall find from the evidence that at the time the plaintiff, Mrs. Howard, executed the release given in evidence she was in bed and ill, and suffering to such an extent that it was a reasonable act upon her part to sign the paper without reading it, and for that reason she did not read it, but relied upon the representations of its contents made by Doctor Brock, and that the latter did not read it to Mrs. Howard, but stated to her that it was a receipt for $200 which he paid her at the time, and that she relied upon said statement and signed the release under the belief that it was a receipt only, and did not know that it was a release until some time afterwards, that the said release was at the time she signed it and is now void as a release, and can not prevent the plaintiffs from recovering if the jury shall find them otherwise entitled; but if Mrs. Howard was in such physical condition as to make it unreasonable, in your judgment under the evidence, for her to rely upon the representations of Doctor Brock instead of reading the paper, or if Doctor Brock read it to her, or if he told her it was a release, then or in either of those events it is valid and bars the action, and your verdict should be for the defendant without enquiring further."

There was no error in this instruction. It defines the issue made by the evidence, and states correctly the law applicable thereto. *Union Pacific Rwy. Co.* v. *Harris,* 158 U. S. 331; *Lusted* v. *C. & N. W. Rwy. Co.,* 71 Wis. 391, 397; *C. R. I. & P. RR. Co.* v. *Lewis,* 109 Ill. 120, 131.

In this view of the case it is wholly unnecessary to consider the question, now raised, whether the legal effect of the release should be governed by the law prevailing in Indiana, Kentucky, or the District of Columbia. No special instruction was asked by the defendant; and the court, having refused a prayer of the plaintiffs to the effect, that under the law in this jurisdiction the execution of the release by the wife alone was insufficient, charged the jury that, unless invalidated by the evidence tending to establish fraud in its procurement, the release would discharge the defendant from liability and entitle it to a verdict.

8. One other contention of the appellant involving the effect of the release remains to be considered. This is, that, assuming it to have been obtained by fraud, the plaintiff remained bound by it because of her failure to offer to return the money received at the time of its execution.

This question does not appear to have been raised by the defendant on the trial; at least, no specific instruction was asked, and there was no exception taken to the failure of the court to include it in the general charge. All that the bill of exceptions shows is, that counsel for defendant moved the court to instruct the jury, that if the plaintiff signed and delivered the release, then parol evidence is inadmissible to contradict and vary it, and the jury should therefore find for the defendant. This the court refused and exception was entered.

It then appears that thereafter plaintiff tendered counsel for defendant the sum of $200 in gold, which he declined to receive. Counsel for the defendant thereupon moved the court to strike out all of the parol evidence of the plaintiff seeking to vary or contradict the release, and this was also refused.

Taken in connection with the tender of the money, this last motion may be inferred to have been directed to this point. Without this aid it would seem to have been directed to the point that, in a court of law, in this jurisdiction, a release under seal could not be impaired by parol evidence.

The case of *Lyons* v. *Allen*, 11 App. D. C. 543, 549, distinctly holds the contrary. But it also holds that where a release has been pleaded and is sought to be avoided on the ground of fraud, the party alleging the fraud must, as a condition of his right to do so, first restore or offer to restore the consideration actually received. In that case, the plaintiff did not deny that he knew he was executing a release of the cause of action; on the contrary, he admitted that he had agreed to execute a release, but charged that the fraud practiced was in deceiving him in respect of the consideration promised. The instrument recited that he was to receive five dollars per week while he remained in the hospital on account of his injuries, whilst the consideration stipulated by him was five dollars per week until he should be able to work. Some of the cases relied on in the opinion of that case, draw a distinction, not necessary therein to be made, between a case where one has executed a release, knowing it to be such, but induced thereto by fraudulent representations, and a case where he has been induced, by like means, to execute a release upon the supposition that it was an instrument of a distinctly different purport. *Drohan* v. *L. S., etc., R.R. Co.*, 162 Mass. 435, 437; *Mullen* v. *Old Colony R.R. Co.*, 127 Mass. 86, 89; and see, also, *Bliss* v. *N. Y. C. & H. R.R.*, 160 Mass. 447.

In this case, for example, the plaintiff contends, and the jury so found, that the money was offered her as a gratuity by the railway company in consideration of her poverty and unfortunate condition, and that she was induced to believe that the paper executed by her was a mere receipt showing that the money had been paid by the representa-

tive of the company, and was in no sense a release of her cause of action.

If offered and received as a gratuity, the instrument, though in form a release is nothing more in reality than a receipt for the money. Not being a release, her avoidance of its effect as such does not involve the rescission of the instrument, but rather its virtual reformation into the harmless thing that it was actually represented and supposed to be, when its execution was obtained. Being a receipt merely for money received for another and distinct purpose, it is not necessary to be set aside in order to maintain the action.

Even if it were a case like that of *Lyons* v. *Allen, supra,* we would be inclined to hold that the rule was satisfied by the tender of the money before the case was finally submitted to the jury. *Smith* v. *Holyoke*, 112 Mass. 517.

As no objection had been made to the evidence on this ground, when offered, the earliest occasion to tender the money was when the foregoing motions were made; and this was then promptly acted upon. The defendant was in no position to object, and did not then object so far as the record shows, that the money ought to have been tendered to the Connecticut corporation, to which the release had been delivered, and could not be made to it (the defendant).

Upon that theory, now for the first time suggested, the release would constitute no defense to the defendant except upon the ground that, being a joint *tort feasor*, a discharge of one is a discharge of all. The entire defense, however, from plea to final judgment has been maintained in opposition to that idea. Offered as a direct discharge of the defendant itself, and as inuring to its benefit as one included among the " lessors or predecessors" of the Connecticut corporation, it can not be permitted, at this stage of the case at least, to say that the tender of the money was of no avail.

Having found no reversible error in the proceedings, the judgment will be affirmed, with costs; and it is so ordered.

*Affirmed.*