## SCHULTZ v. BROWN.

(Circuit Court of Appeals, Ninth Circuit. March 3, 1919.)

### No. 3143.

1. MASTER AND SERVANT ⬦302(1)—TORTS OF SERVANT—MASTER'S LIABILITY.
    Whether a servant's act or omission, injuring a third person, is within the scope of his authority, so as to render the master liable, is to be determined from the surrounding facts and circumstances.

2. MASTER AND SERVANT ⬦302(3)—TORTS OF SERVANT—MASTER'S LIABILITY.
    An aggrieved party cannot recover from a master for an assault by his servant, unless it constituted a violation of an absolute duty owed him by the master, or was within the scope of the tort-feasor's employment.

3. MASTER AND SERVANT ⬦332(2)—TORTS OF SERVANT—MASTER'S LIABILITY.
    In an action for an assault on plaintiff by defendant's sheep herder, whether the herder was acting within the scope of his authority *held*, under the evidence, for the jury.

4. TRIAL ⬦296(2)—INSTRUCTION—CONSTRUCTION AS A WHOLE.
    In an action for an assault on plaintiff by defendant's sheep herder, an instruction as to the herder's duties *held*, in view of others, to be correct.

In Error to the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Action by John Brown against Otto Schultz. There was a judgment for plaintiff, and defendant brings error. Affirmed.

W. B. Rodgers, of Anaconda, Mont., and Henry G. Rodgers, of Dillon, Mont., for plaintiff in error.

Maury, Wheeler & Melzner and A. G. Shone, all of Butte, Mont., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. This is an action for damages for personal injuries inflicted upon John Brown, the defendant in error, by one Dimitre Heinz, a servant of Otto Schultz, the plaintiff in error.

At the time of the injury, Schultz was the owner of a large band of sheep and employed Heinz as his herder. Schultz was also the owner of an uninclosed tract of land about three miles from Silver Star, in Madison county, Mont. To this tract of land a band of sheep owned by Schultz was driven by Heinz, the herder, about the 14th of October, 1916. A few days before this time, Brown, who was herding a band of sheep owned by one Frank Reed, drove his sheep upon the same land. Upon the arrival of Heinz upon the land with the

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

sheep owned by Schultz, he told Brown not to allow his sheep to cross to the north side of a certain creek; that the land on that side of the creek belonged to Schultz. Brown continued to herd his sheep on the north side of the creek until the two bands became mixed, whereupon Elmer Reed, the son of Frank Reed, and one Cowins, the camptender for Schultz, were notified. They came to the place to separate the sheep, and this was accomplished on the morning of October 19, 1916, by the use of a corral; both bands being driven into the corral, and the bands separated by driving out the sheep owned by Schultz and keeping in the corral the sheep owned by Reed. The separation was conducted by Elmer Reed and Cowins. Heinz and Brown drove the sheep through the chute. After the separation had been accomplished, Brown started to the corral to let his sheep out, whereupon Heinz made the assault upon Brown which is the subject of this action.

Elmer Reed testified that he saw the happening of the tort; that he was somewhere around 12 or 15 feet from Brown at the time, and about the same distance from Heinz; that he could overhear the conversation that took place between them; that he could hear Heinz and was talking to him; that he told Heinz Brown must keep his sheep on the other side of the creek; all that Heinz said was that Brown wanted this side of the creek. He did not hear any other statement, and then Heinz struck Brown over the head with a shovel handle, inflicting the injury charged in the complaint. On cross-examination, Reed testified:

"At the time the plaintiff received the injuries, our sheep were in the corral, and Mr. Schultz's sheep were just on the outside. That is Mr. Schultz's land that lies around that corral on that side of the creek. The sheep had been entirely separated at the time Brown received his injuries, and Cowins was up at the barn, I think. There had been no trouble there that morning between any of us; there had been no dispute between Mr. Cowins, Mr. Schultz, and myself; everything had been friendly. Just before the trouble happened, I was talking to Brown about the sheep, showing him where to go, telling him what to do with our sheep when they were taken out of the corral. I told him to go on the south side of the creek, and stay off of Mr. Schultz's land. The corral was on the north side; this land was on both sides of the creek; when I said this to Brown, Dimitra Heinz was opposite me, standing on the opposite side; Heinz had not said or done anything. After I told Brown to take the sheep back on the south side of the creek, and stay away from that place, Heinz said, 'Brown wants this side of the creek.' There was no dispute at that time. Neither Brown nor I were at that time in any way interfering with Mr. Schultz's sheep, or in Heinz's care of Mr. Schultz's sheep. The sheep had been taken to the corral by mutual consent of myself and Mr. Schultz's man, for the purpose of separating them."

Brown testified that Heinz said, "Don't let them cross the creek"—referring to Reed's sheep. Brown says he told Heinz to ask Mr. Reed, to which Heinz appears to have made no reply, but struck Brown over the head with a shovel handle. Cowins was not present when Heinz assaulted Brown. He had gone to the barn to get his horses, and saw none of the fight. After the assault, Heinz crossed the creek, went up the hill towards his camp, and disappeared, and has not been seen since.

This suit, brought by Brown against Schultz for damages for the injury described, is based upon the charge that Heinz, when he committed the assault, was in the employ of Schultz, and was engaged in furthering the business of his master. In a legal sense the charge takes the form that the plaintiff, Brown, was injured by Heinz, a servant of the defendant Schultz, while the servant was acting within the course and scope of his employment.

[1-3] In 26 Cyc. 1533, under the title of "Master and Servant," and the subtitle of "Liability of the Master for Injuries to Third Persons," there is a statement concerning the acts within the scope of employment, with authorities cited in support of the text. The statement is applicable to the question in controversy in this case. It is there said:

"In determining whether a master is liable for the torts of his servants, the most difficult question is whether the particular act or omission of the servant, causing the injury for which the master is sought to be held liable, was committed within the scope of the servant's employment; and this question is in most cases one of fact, to be determined by the jury from the surrounding facts and circumstances. The terms 'course of employment' and 'scope of the authority' are not susceptible of accurate definition. What acts are within the scope of the employment can be determined by no fixed rule; the authority from the master generally being gatherable from the surrounding circumstances. An act is within the scope of a servant's employment, where necessary to accomplish the purpose of his employment, and intended for that purpose, although in excess of the powers actually conferred on the servant by the master."

With respect to the course and scope of Heinz's employment, it is not claimed that he was employed to assault Brown. The claim is that the course and scope of his employment furnished the motive and purpose of the assault, as distinguished from any personal or private animosity of his own. The defendant, Schultz, was called as a witness for the plaintiff. He testified that Heinz—

"was there as a herder, sheep herder; he had no other duties than those of sheep herder. The duties of a sheep herder are to herd the sheep, while they are out on a range, and do his own cooking; he does not select the place where he herds them; the camp tender or foreman does that for him."

Being called later as a witness in his own behalf, he testified:

"I had not given Heinz, who was herding for me, any instructions relative to keeping other people's sheep, or Reed's sheep, or anybody's else sheep, off that land. I always gave my instructions through the camp tender or foreman. The camp tender was Mr. Cowins."

Mr. Cowins, called as a witness for the defendant, testified:

"The sheep herder has no duty relative to where he herds his sheep. It is the camp tender's or boss' duty to instruct him where to herd the sheep. When any dispute arises over range questions, grass, or over the mixing of sheep, the sheep herder has no duty, only to put the sheep through the corral and do as the camp tender tells him to."

But this witness, on cross-examination, testified:

"When I was away telephoning, and on other matters, Heinz had the herding of the sheep; the sheep moved around while they were herding and grazing, and were under his control. He directs their place of herding when I am away, and was on the 18th of October of last year."

On further cross-examination, this witness was permitted to testify without objection that:

"Dan [Heinz] said, 'This man wants trouble all the time;' and after he went out we had a conversation, and I told him not to have any trouble, that the sheep would be separated in a day or two, and Dan [Heinz] said he would not. Dan wanted to herd off of these sections, and John Brown wanted to herd on the sections, and John would get on one side of the sheep, and drive them towards the sections, and Dan would get on the other side to try and keep them off; and after I told him not to have any trouble, Dan turned away and let them go on the sections, rather than have any trouble with Brown. I did not fear any trouble between them after I told him. I feared there would be trouble between them after he got on one side and drove them, and Dan the other way; but I was positive there would be no trouble after I told him not to have any trouble. Dan did not tell me that he was going to stop him. I thought from his conversation he was going to have trouble; from Dan's conversation. Dan just said, 'This kind of a man wants trouble all the time;' that is all he said in regard to that, and told me about the way that Brown would drive the sheep onto the sections, and he would drive them off, and from what he said I thought probably he would cause trouble if I did not stop him—about the sheep, if I did not stop him; there was no other cause of anger between the men that I know of; I never saw any other trouble. I was working for Schultz."

This testimony tends to prove that prior to the assault there were signs of trouble between Heinz and Brown concerning the herding of the sheep; that there was no other cause of trouble between them; that at the time of the assault neither Schultz, the owner of the sheep, nor Cowins, his sheep tender, was present; that after the separation of the two bands of sheep Heinz was the only representative of Schultz authorized to act for him in keeping the two bands apart, and, acting within the scope of that authority, he assaulted Brown, because the latter would not say that thereafter he would keep the Reed sheep off the Schultz land.

The liability of the master for an assault of the servant is thus stated by Labatt on Master and Servant, par. 2347, p. 7085:

"A master who actually authorizes an assault by a servant upon a third person is, of course, liable for the resulting injury. For an assault not so authorized, the aggrieved party cannot recover damages unless he shows either (1) that it constituted a violation of an absolute duty owed to him by the master; or (2) that it was within the scope of the tort-feasor's employment. Whether it was an act of the latter description is ordinarily a question for the jury. If the question is answered in the affirmative, the assault is imputable to the master, although the servant may, in respect of its commission, have transcended the actual limits of his authority, or may have been specially instructed not to commit it. Nor is the action any the less maintainable, because an assault is a criminal offense as well as a civil wrong."

There is also some evidence tending to prove that Schultz ratified the act of Heinz in assaulting Brown. Brown testified:

"Before I left the Madison Valley, I talked with Mr. Schultz, about six weeks after I got hurt; I talked with him in Twin Bridges, and he said, 'How did I feel?' and I said, 'Pretty fair;' and he say, 'Don't bother my land any more, or you will get hurt again.'"

We think this evidence was sufficient to take the case to the jury, and that it was for the jury to determine whether, upon such evidence, Heinz, at the time he made the assault upon Brown, was acting within

the scope of his employment, and not from any personal or private animosity of his own.

[4] It is assigned as error that the court instructed the jury as follows:

"If this herder of the defendant, because of the difficulty that the two herders had before, one trying to herd a certain place and the other trying to keep them off, if the defendant's herder, because of that, and in punishment of that, and in punishment and retaliation for that, struck this plaintiff the blows that have been testified to, and which apparently he did, then that would be so closely connected with the difficulties over the place of herding a day or two before that you have a right to say that it was an incident of his duties of a few days before, always within the scope of his employment, and for which the defendant is liable."

It is contended that this in effect was an instruction to the jury that, after the completion of the wrong to his master in the herding of the sheep, it was within the scope of the servant's authority to inflict punishment upon the wrongdoer or assault him by way of retaliation.

We do not so read the instruction. Immediately preceding the instruction to which exception was taken, the court instructed the jury as follows:

"Now, gentlemen of the jury, in so far as there had been any difficulties between the two herders a day or two days or three days before, possibly up to the time of the separation that was going on, and the morning when they came to separate the sheep, there was nothing for each herder to do, except take his sheep and drive them away. At the same time, although this herder of the defendant may have been ordered not to attempt to drive away trespassers, and not to get involved in any trouble," etc.

Immediately following the instruction to which exception was taken, the court advised the jury that the incident referred to was for them to consider as furnishing an inference in one way that Heinz was acting for his master, in another that he was acting in satisfaction of a private grudge against the plaintiff. The court said:

"It is an inference for you to draw. If, on the other hand, it was not done for that purpose, if that man Heinz had some private grudge against this plaintiff, or if he merely wanted to satisfy his own resentment, with no idea that he was going to help out his master, even in a case where his master had forbidden him, then you may say it was not incident to his employment, and at that time and place the defendant would not be liable."

The court, at the very outset of its instructions, had said:

"You take the law from the court; that is your duty. You take the facts upon your own judgment from the evidence; that, also, is your duty. If the court should comment on the facts, it is not to control your judgment, but solely in the way that it might aid you to arrive at a fair and proper conclusion; you are not bound by any expression of the court in reference to the facts, but arrive at such conclusion as your judgment dictates; who you will believe, how much weight you will give to evidence, what inference you will draw from circumstances and proof, is wholly for your judgment."

We think these instructions are correct, and that they are to be commended for their clearness, and the judicious reference that was made to the testimony, and the inferences to be drawn therefrom.

The case was one particularly for the jury upon the facts proven, and in view of all the surrounding circumstances.

Finding no error in the record, the judgment of the District Court is affirmed.