# DENVER AND RIO GRANDE RAILWAY *v*. HARRIS.

ERROR TO THE SUPREME COURT OF THE TERRITORY OF NEW
MEXICO.

Argued May 5, 1887.—Decided May 27, 1887.

If a claimant of real estate, out of possession, resorts to force and violence amounting to a breach of the peace to obtain possession from another claimant who is in peaceable possession, and personal injury arises thereupon to the latter, the party using such force and violence is liable in damages for the injury without regard to the legal title, or to the right of possession.

*Iron Mountain and Helena Railroad* v. *Johnson*, 119 U. S. 608, affirmed and applied.

A corporation is liable for *civiliter* torts committed by its servants and agents done by its authority, whether express or implied.

In trespass on the case to recover for injuries caused by gunshot wounds inflicted by defendant's servants, evidence of the loss of power to have offspring, resulting directly and proximately from the nature of the wound, may be received and considered by the jury, although the declaration does not specify such loss as one of the results of the wound.

In an action of trespass on the case against a corporation to recover damages for injuries inflicted by its servants in a forcible and violent seizure of a railroad, punitive damages, within the sum claimed in the declaration, may be awarded by the jury, if it appears to their satisfaction that the defendant's officers and servants, in the illegal assault

complained of, employéd the force with bad intent, and in pursuance of an unlawful purpose, wantonly disturbing the peace of the community and endangering life.

The Atchison, Topeka and Santa Fé Railway Company was in peaceable possession of a railroad from Alamosa to Pueblo, and while so in possession, the Denver and Rio Grande Railway Company, by an armed force of several hundred men, acting as its agents and employes, and under its vice-president and assistant general manager, attacked with deadly weapons the agents and employes of the Atchison, Topeka and Santa Fé Railway Company having charge of the railroad, and forcibly drove them from the same, and took forcible possession thereof. There was a demonstration of armed men all along the line of the railroad seized, and while this was being done, and the seizure was being made, the plaintiff, an employe of the Atchison, Topeka and Santa Fé Railway Company, while on the track of the road, in the line of his employment, was fired upon by men as he was passing, and seriously wounded and injured. Immediately upon the seizure of the railroad as aforesaid, the Denver and Rio Grande Company accepted it, and entered into possession and commenced and for a time continued to use and operate it as its own. The plaintiff brought this suit to recover damages for his injuries. *Held*, that the Denver and Rio Grande Company was liable in tort for the acts of its agents, and that the plaintiff could recover damages for the injuries received, and punitive damages under the circumstances.

THIS action was brought by James Harris, the defendant in error, against the Denver and Rio Grande Railway Company, a corporation of the state of Colorado, to recover damages for injuries which, he alleges, were sustained by him, in his person, by reason of an illegal and wrongful assault made by that company, acting by its servants and agents. The plea was not guilty. There was a verdict and judgment in favor of the plaintiff for nine thousand dollars. The judgment was affirmed in the Supreme Court of the territory, and has been brought here for review.

The defendant introduced no evidence, although its officers were the chief actors on the occasion when the plaintiff was injured. The case made by the latter and other witnesses testifying in his behalf, is stated by the Supreme Court of the territory, in the following extract from its opinion: —

" The record discloses the fact that there was evidence on the trial in the lower court to the effect that about the tenth or twelfth of June, 1879, the Atchison, Topeka and Santa Fé

Railway Company was in peaceable possession, by its agents and employes, of a certain railroad in the state of Colorado, running from Alamosa to the city of Pueblo, in that state; that at or about that date, and while the Atchison, Topeka and Santa Fé Railway Company was so in possession of said railroad, the plaintiff in error, the Denver and Rio Grande Railway Company, by an armed force of several hundred men, acting as its agents and employes, and under its vice-president and assistant general manager, attacked with deadly weapons the agents and employes of said Atchison, Topeka and Santa Fé Railway Company having charge of said railroad, and forcibly drove them from the same, and took forcible possession thereof; that there was a demonstration of armed men all along the line of the railroad seized, and while this was being done, and the seizure was being made, the defendant in error, who was an employe of the Atchison, Topeka and Santa Fé Railway Company, on said line of railroad, and while on the track of the road, and on a hand-car thereon, in the line of his employment, was fired upon by men as he was passing, and seriously wounded and injured; that immediately upon the seizure of the railroad as aforesaid the plaintiff in error accepted it, and at once entered into possession thereof, and commenced and for a time continued to use and operate the same as its own.

*Mr. Charles M. Da Costa* for plaintiff in error.

A writ of error always brings up to the superior court the whole record of the proceedings in the court below. *Dred Scott v. Sanford,* 19 How. 393, 403. "But the present case being brought here on a writ of error, the whole record is under the consideration of the court." *Bank of the United States* v. *Smith,* 11 Wheat. 171, 173. There can be no doubt that anything appearing upon the record which would have been fatal upon a motion in arrest of judgment is equally fatal upon a writ of error. Marshall, C. J., in *Slacum* v. *Pomery,* 6 Cranch, 221.

The evidence which was before the court and jury at the

time the charge was delivered, and which constituted a part of the record when the motion in arrest was made, did not disclose a case which in law supported the declaration, or entitled the plaintiff to recover.

The declaration is in trespass. It is so identified, first, because it uses the test words "force and arms," which are the translation of the original and characteristic words, "*vi et armis*," and, secondly, because it avers that the defendant "unlawfully and wrongfully made an assault and beat, bruised and wounded," which in legal effect is adding the words "*et contra pacem*," which further distinguish and identify the action of trespass. Comyn, Action, M. 2, note 2.

The plaintiff's declaration thereof is of a criminal assault with a deadly weapon, with intent to kill. The Criminal Code of Colorado, within which the assault took place, contains these provisions:

"§ 19. Murder is the unlawful killing of a human being with malice aforethought, either express or implied.

"§ 20. Express malice is the deliberate intention unlawfully to take away the life of a fellow-creature, which is manifested by external circumstances capable of proof.

"§ 53. An assault with intent to commit murder shall subject the offender to confinement in the penitentiary for a term of not less than one year nor more than fourteen years.

"§ 137. If two or more persons meet to do an unlawful act upon a common cause of quarrel, and make advances towards it, they shall be guilty of a rout, and on conviction shall be severally fined in a sum not exceeding seventy dollars, or imprisoned in the county jail not exceeding four months.

"§ 183. If any person shall have upon him any pistol, gun, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisonment in the county jail not exceeding six months."

It appears from the plaintiff's evidence: 1. That he criminally armed himself; 2. That being so armed, he voluntarily, and in his individual capacity, and not as a "watchman," went out to meet those similarly armed, upon a common

cause of quarrel, and with intent to kill them if he could — "I gave the order to the other boys to return the fire; we kept up the firing for ten or fifteen minutes. I said to the rest of the boys, 'You had better quit firing, boys; there is a train coming in front, and I guess they have got more men'" — and 3. That in the "rout" so occasioned he was shot.

The judicial inquiry, therefore, is, whether, when such circumstances are proved by the plaintiff as his case, he has any legal cause of action against the person by whom he was shot, and whether the evidence adduced supported the declaration, which purported to set forth a good cause of action in trespass.

Under the given circumstance, the precepts and maxims of the higher civil and common law are adverse to the acknowledgment of any right of action on the part of the joint and criminal wrongdoer, for, as was said in *Rex* v. *Billingham*, 2 Carr & P. 234, where the prisoners were indicted for a riot, "By law whatever is done in such an assembly by one, all present are equally liable for."

For centuries the former law has declared that "they who take the sword, shall perish with the sword," and it would be new in principle to hold that, because the "perishing" was incomplete, a cause of action accrued. Though it is not a conclusive objection that an action be new in the instance, it is a persuasive argument against its maintenance that, in the multiform complexity of human concerns, no similar action has been maintained. "If a case in law have no cousin or brother, it is a sure sign that it is illegitimate." Ld. Bacon, Spedding's ed., v. 7, p. 607. It is not believed that any case can be found in which one injured in a duel has been allowed to recover therefor from his antagonist, or in which, when one went out avowedly to murder some one, and has been injured before the homicide was effected, he has been allowed to recover. The going out of A with intent to shoot B, and B's shooting A after A has discharged his gun, does not seem from the reports as yet to give a cause of action to A. Even if B were indictable by the commonwealth, that would not demonstrate his civil liability to one *in pari delicto*, for the general rule would seem to be as stated by Lord Lyndhurst, in *Moriarty* v.

*Brooks*, 6 Carr & P. 684:-" If a person comes up to attack me, and I put myself in a fighting attitude to defend myself, this is not an assault on my part." Nor in this connection is it a matter of moment that the person who discharged the gun might have been personally a trespasser. *McEvoy* v. *Drogheda*, 16 Weekly Reporter, 34; *Adams* v. *Waggoner*, 33 Ind. 531; *Bell* v. *Hansley*, 3 Jones, 131, and other similar cases do not conclude the question which arises on the case, as made by the plaintiff and not by way of evidence for the defence, nor affirmatively settle the law that the given case is not concluded by the application thereto of well settled precepts and maxims of the civil and common law. Among these precepts and maxims are the following: *Consentio et agento pari pœna plectentur*, 5 Rep. 80; and *In pari delicto potior est conditio defendentis*, which is a maxim of public policy equally respected in courts of law and equity. *Taylor* v. *Chester*, L. R. 4 Q. B. 309; see Story Eq. Jur. § 298; Broom's Leg. Max. 728; *Colburn* v. *Patmore*, 1 Cr. M. & R. 73, 83, where it is said: "I know of no case in which a person, who has committed an act declared by law to be criminal, has been permitted to recover compensation against a person who acted jointly with him in the commission of the crime. It is not necessary to give any opinion upon this point, but I may say that I entertain little doubt that a person who is declared by law to be guilty of a crime cannot be allowed to recover damages against another who has participated in its commission."

*Ex turpi causa non oritur actio.*

*Volenti non fit injuria.*

Consent is a perfect shield in civil injury.

Thus in *Fivaz* v. *Nicholls*, 2 C. B. 501 *et seq.*, which was an action brought for an alleged conspiracy between the defendant and one C. to obtain payment of a bill of exchange, accepted by the plaintiff in consideration that B. would cease from prosecuting C. for a crime, it was held that the action would not lie, inasmuch as it sprang out of an illegal transaction in which both the plaintiff and defendant had been engaged, and of which proof was essential to establish the plaintiff's claim.

. In *Holman* v. *Johnson*, Cowp. 341, 343, it was said: "The principle of public policy is this, *ex dolo*, &c. No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act," and what is illegality was stated in *Degroot* v. *Van Duzer*, 20 Wend. 390, to be, "the intention to aid in a violation of the law."

So also it was said in *Lowell* v. *Boston & Lowell Railroad*, 23 Pick. 24, 32 [*S. C.* 34 Am. Dec. 33], that the general rule of law is that where two parties participate in the commission of a criminal act, and one party suffers damages thereby, he is not entitled to indemnity or contribution from the other party. So also is the rule of the civil law, "*nemo ex delicto consequi potest actionem.*" Here the plaintiff and the man who shot him were, upon the plaintiff's evidence, jointly engaged in an attempt to commit the murder of whomsoever they might shoot, and the crime was none the less joint because each proposed to shoot the members of the opposing party, and not their friends.

Again. He who voluntarily fires upon an opposing party consents that such fire with all its consequences may be returned. Like a man who goes unnecessarily where he is advised that there are spring guns, he does so at his own peril. See also *Holt* v. *Wilkes*, 3 B. & Ald. 304; *Stout* v. *Wren*, 1 Hawks, 420; *Galbraith* v. *Fleming*, 27 N. W. Rep. N. S. 581; *Queen* v. *Guthrie*, L. R., 8 Q. B. D. 553; *Champer* v. *State*, 14 Ohio St. 437; *Duncan* v. *Commonwealth*, 6 Dana, 295; *Smith* v. *State*, 12 Ohio St. 466, 470 [*S. C.* 80 Am. Dec. 355].

The ingenious device of defeating the effect of the assent by asserting that it is invalid, because the law does not permit an assent to be given to that which is criminal, was summarily and properly disposed of in *State* v. *Cooper*, 2 Zabr. (22 N. J. Law) 52, 53, in these words: "It was insisted upon the argument that the assent of the mother was null [to an attempt to procure abortion before she was quick with child]; that the offence was of so high a nature that no assent of hers could purge the criminality. But this, it is obvious, is begging the question. The charge of assault against the person of the mother is clearly purged of criminality by her assent. The indictment is valid, but if, upon the trial, it appears that the

means used to procure the abortion were used with the consent of the mother, the defendant must be acquitted."

Under such circumstances, the maxims "*Ex turpi*," "*In pari delicto*," and "Consent is a perfect shield," apply, and are decisive of the case, *Taylor* v. *Chester*, L. R., 4 Q. B. 314. If they are so decisive, then a charge which asserted an absolute right to recover and a ruling which refused to arrest the judgment because there was no evidence to support the declaration, were alike erroneous, and require a reversal of the judgment, as such charge and ruling were duly excepted to at the time.

Upon the exceptions to the admission of evidence as to facts and declarations both prior and subsequent to the injury, the case of *Vicksburg* v. *O'Brien*, 119 U. S. 99, is relevant upon the question of what evidence is so connected with the *res gestæ* as to be admissible; and the case of *Moore* v. *Arlam*, 2 Chitty, 198, is relevant as to the evidence of the special damage, in which Bayley, J., stated the rule as follows: "The rule as to special damage is that you may give in evidence any special damage which is the clear and immediate result of the act complained of, but you cannot give in evidence as special damage any remote consequences." A supposed inability hereafter to procreate would seem to be rather a remote consequence from a gunshot wound in the hip, especially as the attempt does not appear to have been made, and before evidence thereof was admissible that result should have been pleaded as the clear and immediate result of the wound. It is not believed that the literature of the medical profession would afford any easily accessible precedent establishing that the "swelling" and "wasting away" described on p. 13 of the record, and so strongly submitted in the charge were the "clear and immediate result" of a ball passing through the hip. But if it would, the defendant was entitled to notice in the declaration that that result would be proved as "a clear and immediate" one, so as to enable it to be prepared to meet the evidence adduced.

*Mr. John M. Waldron* and *Mr. Edward O. Wolcott* also filed a brief for plaintiff in error.

*Mr. John H. Knaebel* for defendant in error.

MR. JUSTICE HARLAN, after stating the case as above reported, delivered the opinion of the court.

One of the propositions advanced by counsel for the company is this: That it appears from the plaintiff's case, and by his evidence, that he voluntarily armed himself, and taking the law into his own hands, joined an illegal assembly for the purpose, if necessary, of committing murder; that, in the course of the riot and rout, he received a wound at the hands of those whom he had sought by violence to destroy; that, under such circumstances, the law will not permit him to recover for an alleged assault, but conclusively presumes his assent thereto; nor will the law permit him to recover through the medium and by the aid of an illegal transaction, to which he was a party, and which constitutes the foundation of his case.

The same proposition was stated in another form in argument: That the plaintiff engaged voluntarily, and not for his necessary self-defence, in a physical combat with others, and cannot, upon principle, maintain a civil action to recover damages for injuries received in such combat at the hands of his adversary, unless the latter beat him excessively or unreasonably; this, upon the ground that, " where two parties participate in the commission of a criminal act, and one party suffers damages thereby, he is not entitled to indemnity or contribution from the other party."

These propositions have no application in the present case. The evidence, taken together, furnishes no basis for the suggestion that the plaintiff voluntarily joined an illegal assembly for the purpose, if necessary, of committing murder, or any other criminal offence. Nor does it justify the assertion that he voluntarily engaged in a physical combat with others. All that he did on the occasion of his being injured was by way of preparation to protect himself, and the property of which he and his co-employes were in peaceable possession, against organized violence. It appears in proof,

as stated by the court below, that the Atchison, Topeka and
Santa Fé Railroad Company was in the actual, peaceable pos-
session of the road when the other company, by an armed
body of men, organized and under the command of its chief
officers, proceeded, in a violent manner, to drive the agents
and servants of the former company from the posts to which
they had been respectively assigned. It was a demonstration
of force and violence, that disturbed the peace of the entire
country along the line of the railway, and involved the safety
and lives of many human beings. It is a plain case, on the
proof, of a corporation taking the law into its own hands,
and by force, and the commission, of a breach of the peace
determining the question of the right to the possession of a
public highway established primarily for the convenience of
the people. The courts of the territory were open for the
redress of any wrongs that had been, or were being, com-
mitted against the defendant by the other company. If an
appeal to the law, for the determination of the dispute as to
right of possession, would have involved some delay, that was
no reason for the employment of force — least of all, for the
use of violent means under circumstances imperilling the peace
of the community and the lives of citizens. To such delays
all — whether individuals or corporations — must submit, what-
ever may be the temporary inconvenience resulting therefrom.
We need scarcely suggest that this duty, in a peculiar sense,
rests upon corporations, which keep in their employment large
bodies of men, whose support depends upon their ready obe-
dience of the orders of their superior officers, and who, being
organized for the accomplishment of illegal purposes, may
endanger the public peace, as well as the personal safety and
the property of others besides those immediately concerned in
their movements.

These principles, under somewhat different circumstances,
were recognized and enforced by this court at the present
term. One Johnson was in the actual, peaceable possession of
eighteen miles of a railroad built by him for a railroad com-
pany, and was running his own locomotives over it. He
claimed the right to hold possession until he was paid for his

work. But the company, disputing his right to possession, ejected him by force and violence. He brought his action of forcible entry and detainer. This court said that the party "so using force and acquiring possession may have the superior title, or may have the better right to the present possession, but the policy of the law in this class of cases is to prevent disturbances of the public peace, to forbid any person righting himself in a case of that kind by his own hand and by violence, and to require that the party who has in this manner obtained possession shall restore it to the party from whom it has been so obtained; and then, when the parties are in *statu quo*, or in the same position as they were before the use of violence, the party out of possession must resort to legal means to obtain his possession, as he should have done in the first instance." *Iron Mountain & Helena Railroad* v. *Johnson,* 119 U. S. 608, 611. While this language was used in a case arising under a local statute, relating to actions of forcible entry and detainer, it is not without force in cases like this, where the peaceable possession of property is disturbed by such means as constitute a breach of the peace. If, in the employment of force and violence, personal injury arises therefrom to the person or persons thus in peaceable possession, the party using such unnecessary force and violence is liable in damages, without reference to the question of legal title or right of possession.

Reference was made in argument to those portions of the charge that refer to the liability of corporations for torts committed by their employes and servants.

In *Philadelphia, Wilmington & Baltimore Railroad* v. *Quigley,* 21 How. 202, this court held that a railroad corporation was responsible for the publication by them of a libel, in which the capacity and skill of a mechanic and builder of depots, bridges, station-houses, and other structures for railroad companies, were falsely and maliciously disparaged and undervalued. The publication, in that case, consisted in the preservation, in the permanent form of a book for distribution among the persons belonging to the corporation, of a report made by a committee of the company's board of directors, in relation

to the administration and dealings of the plaintiff as a superintendent of the road. The court, upon a full review of the authorities, held it to be the result of the cases, "that for acts done by the agents of a corporation either *in contractu* or *in delicto*, in the course of its business, and of their employment, the corporation is responsible as an individual is responsible under similar circumstances." In *State* v. *Morris & Essex Railroad*, 23 N. J. Law (2 Zabriskie) 369, it was well said that, "if a corporation has itself no hands with which to strike, it may employ the hands of others; and it is now perfectly well settled, contrary to the ancient authorities, that a corporation is liable *civiliter* for all torts committed by its servants or agents by authority of the corporation, express or implied. . . . The result of the modern cases is, that a corporation is liable *civiliter* for torts committed by its servants or agents precisely as a natural person; and that it is liable as a natural person for the acts of its agents done by its authority, express or implied, though there be neither a written appointment under seal nor a vote of the corporation constituting the agency or authorizing the act." See also *Salt Lake City* v. *Hollister*, 118 U. S. 256, 260; *New Jersey Steamboat Company* v. *Brockett*, 121 U. S. 637; *National Bank* v. *Graham*, 100 U. S. 699, 702. The instructions given to the jury were in harmony with these salutary principles. Whatever may be said of some expressions in the charge, when detached from their context, the whole charge was as favorable to the defendant as it was entitled to demand under the evidence.

One of the consequences of the wound received by the plaintiff at the hands of the defendant's servants was the loss of the power to have offspring — a loss resulting directly and proximately from the nature of the wound. Evidence of this fact was, therefore, admissible, although the declaration does not, in terms, specify such loss as one of the results of the wound. The court very properly instructed the jury that such impotency, if caused by the defendant's wrong, might be considered in estimating any compensatory damages to which the plaintiff might be found, under all the evidence, to be entitled. *Wade* v. *Leroy*, 20 How. 34, 44.

The court also instructed the jury that they were not limited to compensatory damages, but could give punitive or exemplary damages, if it was found that the defendant acted with bad intent, and in pursuance of an unlawful purpose to forcibly take possession of the railway occupied by the other company, and in so doing shot the plaintiff, causing him incurable and permanent injury; always bearing in mind that the total damages could not exceed the sum claimed in the declaration. This instruction, the company contends, was erroneous. Its counsel argue that, while a master may be accountable to an injured party to the extent of compensatory damages for the wrongful acts of his servant — provided the servant is acting within the general scope of his employment in committing the injury — even though the master may not have authorized or may have even forbidden the doing of the particular act complained of, yet he cannot be mulcted in exemplary damages unless he directed the servant to commit the special wrong in question in such manner as to personally identify himself with the servant in the perpetration of the injurious act.

The right of the jury in some cases to award exemplary or punitive damages is no longer an open question in this court. In *Day* v. *Woodworth*, 13 How. 363, 371, which was an action of trespass for tearing down and destroying a mill-dam, this court said that in all actions of trespass, and all actions on the case for torts, "a jury may inflict what are called exemplary, punitive, or vindictive damages, upon a defendant, having in view the enormity of his offence rather than the measure of compensation to the plaintiff;" and that such exemplary damages were allowable "in actions of trespass where the injury has been wanton or malicious, or gross and outrageous." The general rule was recognized and enforced in *Philadelphia, Wilmington & Baltimore Railroad Co.* v. *Quigley*, which, as we have seen, was an action to recover damages against a corporation for a libel; in the latter case, the court observing that the malice spoken of in the rule announced in *Day* v. *Woodworth* was not merely the doing of an unlawful or injurious act, but the act complained of must have been conceived "in the spirit of mischief or of criminal indifference to civil obli-

gations." See also *Milwaukee & St. Paul Railway* v. *Arms*, 91 U. S. 489, 492; *Missouri Pacific Railway* v. *Humes*, 115 U. S. 512, 521; and *Barry* v. *Edmunds*, 116 U. S. 550, 562, 563.

The court, in the present case, said nothing to the jury that was inconsistent with the principle as settled in these cases. The jury were expressly restricted to compensatory damages, unless they found from the evidence that the defendant acted with bad intent and in pursuance of an unlawful purpose to employ force to dispossess the other company. The doctrine of punitive damages should certainly apply in a case like this, where a corporation, by its controlling officers, wantonly disturbed the peace of the community, and by the use of violent means endangered the lives of citizens in order to maintain rights, for the vindication of which, if they existed, an appeal should have been made to the judicial tribunals of the country. That the defendant, within the meaning of the rule holding corporations responsible for the misconduct of their servants in the course of its business and of their employment, directed that to be done which was done, it is not to be doubted from the evidence, the whole of which is given in the bill of exceptions. Its governing officers were in the actual command and directing the movements of what one of the witnesses described as the "Denver and Rio Grande forces," which were avowedly organized for the purpose of driving the other company and its employes, by force, from the possession of the road in question.

Other questions were discussed by counsel, but they do not, in our judgment, deserve consideration. Substantial justice has been done without violating any principle of law in the admission of evidence, or in the granting or refusing of instructions.

*The judgment is affirmed.*