Argued July 24; modified October 8; rehearing denied
November 19, 1935

# McCARTHY *v.* GENERAL ELECTRIC CO. ET AL.
(49 P. (2d) 993)

*Charles A. Hart,* of Portland (Simon, Gearin, Humphreys & Freed and Carey, Hart, Spencer & McCulloch, all of Portland, on the brief), for appellants.

*Paul R. Harris,* of Portland (Davis & Harris, C. W. Robison, and C. J. Stocklen, all of Portland, on the brief), for respondent.

BELT, J. This is an action for alleged malicious conversion of property owned by plaintiff valued at $10.16. The defendants General Electric Company and Graybar Electric Company filed separate answers generally denying the conversion and the alleged damages. The defendant A. B. Young was the credit and office manager of the Graybar Electric Company. The cause was submitted to a jury and a verdict returned in favor of plaintiff against all defendants for $10.16 compensatory damages and $1,500 punitive damages. From the judgment based thereon the defendants appeal.

The motions of the defendants General Electric Company and Graybar Electric Company for directed verdicts require a statement of the facts out of which this action arose. In view of the legal questions presented the evidence must be stated and reviewed in the light most favorable to the plaintiff.

On June 28, 1933, and for some years prior thereto, plaintiff owned and operated a small electrical supply business in the city of Portland. He was also an electrical contractor. While away from his place of business engaged in contract work—which occupied the greater part of his time—the business was in charge of one Shorthill who had a radio shop in the rear room. In December, 1932, the plaintiff entered into a contract with the General Electric Company for the sale of

lamps manufactured by that company. The goods were under consignment, title being reserved in the electric company. When the plaintiff sold the lamps he was obliged, under the terms of his contract, to remit the proceeds to the company less his commission. The Graybar Electric Company, under and by virtue of contractual relations with the General Electric Company, was authorized "to act for and in place of the manufacturer in serving the agent and receiving reports and money due the manufacturer hereunder".

Plaintiff became somewhat in arrears on his account with the General Electric Company and, on June 28, 1933, the date of the alleged conversion, there was a balance of $17.14 due the company. It appears, however, that the Graybar Electric Company, pursuant to its contract with the General Electric Company, had, prior to that date, remitted to such company the amount due on the lamps.

Young, the credit manager, was persistent in his efforts to collect from the plaintiff. On June 28, 1933, he called at the latter's place of business while Shorthill was in charge and desired permission to take certain electric switches and plates in the store as part settlement of the lamp account. At this juncture it is well to bear in mind that these electric switches and plates which Young desired to take had been purchased for cash by plaintiff from the Graybar Electric Company in October, 1932. The General Electric Company had nothing whatever to do with the transaction.

We now turn to the testimony of Shorthill as to what occurred. He thus testified:

"A. He came in and asked for Mr. McCarthy, and I said he is out on a job—a contracting job on the east side—and he said he had come in after some goods that were on the shelf, and I told him I had no authority to

let him take them away, and he said he was with a big company, with the Graybar Company, and he would stand back of me if I would let him take the stuff, and he was angry because I would not, and I said that he had to get a written statement from Mr. McCarthy saying he could remove them, and he said he would be back in the morning to get the stuff then, and he said, 'You tell Mr. McCarthy I'll be back,' but Mr. McCarthy did not return, and I did not see him, and the next morning he came back to get the goods.''

* * * * *

''Q. What was said when he got the goods? A. He asked if I had seen Mr. McCarthy, and I said no, I had not. I told him I did not.

* * * * *

''Q. Just tell what else was said, if anything, by you or Mr. Young. A. Well then he asked me for the goods, and I said that I had not seen Mr. McCarthy, and I wouldn't have anything to do with it whatever, and I went back into the back part and began work on a radio, and he came in about a half hour and said, 'Here is an invoice of what I am taking,' and I said, 'I don't want anything to do with it at all. It is between you and Mr. McCarthy,' and I don't know whether he left an invoice on the desk or not, and then he came in August, and he said, 'Look these papers over and sign them,' and I read them over and I said, 'I don't want to sign anything like that'.''

Cross-examination:

''Q. You were looking after the store in Mr. McCarthy's absence, and you told him that he could not take them? A. Yes.

''Q. You wouldn't let him do that? A. No.''

Stephen F. Sinpolis testified that he was in the rear of the store at the time Young came for the goods and that he heard Young say, ''I have to take that merchandise'', and that Shorthill said to him, ''You can't

take any merchandise out of here unless you have a written order from McCarthy''. Whereupon, according to Sinpolis, Young said, ''Well, I know what I am about and I will take this merchandise'', and Shorthill replied, ''No, you will not take it''.

Plaintiff testified that he never consented to the taking of the goods and that no person ever talked to him about taking them. The evidence offered on behalf of the defendants tended to show that Shorthill consented, but no purpose is served by setting forth such evidence as the question under consideration is whether the plaintiff established a prima facie case. Assuming that Shorthill did consent, we are not convinced that he had express or implied authority so to do.

After Young, the credit manager, had taken the goods in question from plaintiff's place of business, the value thereof, viz, $10.16, was credited on the lamp account of plaintiff. The same day a credit slip was mailed to plaintiff. Young testified that he met the plaintiff on the street a few days after mailing the credit memorandum and asked him if he received it and that plaintiff said, ''I don't know. I have been out of town a long time'', and that he (Young) said, ''That's all right, when you get to your office you will find it there''.

Defendants contend: (1) That plaintiff has sustained no actual damages since the admitted value of the goods alleged to have been converted was credited on his indebtedness and was so accepted by him, and (2) that there is no evidence to support a verdict for punitive damages, assuming that actual damages were sustained.

■ The evidence clearly shows conversion. It was an unlawful exercise of dominion over the property of the plaintiff. Can the action be barred by evidence tending

to show a credit on the indebtedness of the plaintiff? If the goods had been returned to plaintiff and accepted by him, it would not be a bar to the action but would be considered only in mitigation of damages: The Law of Conversion (Bowers) § 699; *Eldridge v. Hoefer,* 45 Or. 239 (77 P. 874). In the instant case plaintiff did not expressly consent to such credit and we are not prepared to say, as a matter of law, that he acquiesced in its being made: 65 C. J. 149. To hold that a creditor may go into a place of business, in the absence of the owner, take goods from the shelves, and apply the value thereof to an overdue indebtedness without the knowledge or consent of the owner would, indeed, create a dangerous precedent. We can not sanction such a method of collection. As stated in *Northrup v. McGill,* 27 Mich. 234:

"No creditor, without process, and without authority or right, except such as belongs to him as creditor, can dispossess his debtor of his goods, and then mitigate or defeat a recovery by showing that the property taken has, without any assent or concession of the debtor, been applied on the debt."

Also see *Michael-Swanson-Brady Produce Co. v. Oregon Short Line R. Co., et al.,* 219 Mo. App. 419 (271 S. W. 854), and *East v. Pace,* 57 Ala. 521.

It appears to be a case wherein the zeal of the credit manager greatly exceeded his judgment. The fact that action was commenced on July 13, 1933, to recover for the conversion tends to refute the idea of acquiescence. Plaintiff lost no time in asserting his rights. We conclude, therefore, that he has shown actual damages, viz, the value of the goods at the time and place of conversion.

■■ We see no liability against the defendant General Electric Company. It had been paid in full for the

lamps consigned to the plaintiff. The converted property was not sold by it to the plaintiff. It never, in any manner, participated in the wrongful acts of the Graybar Company acting through its credit manager. A directed verdict should have been granted in its favor. Some question is raised by plaintiff concerning the alleged failure of the General Electric Company to take an exception to the ruling of the court in denying the motion for directed verdict, but it is believed that the interests of justice demand a consideration of the assignment of error. A trial should be something more than a mere game of chess. An exception was taken by counsel for the Graybar Electric Company and it was he who conducted the defense in general for both the companies involved.

■ Having held that there is evidence showing actual damages, it remains to be determined whether the finding of the jury as to punitive damages can be sustained. The trial court held, as a preliminary matter of law, that such issue was a matter for the consideration of the jury. We think no error was committed. If the evidence offered on behalf of the plaintiff is to be given full faith and credit, it seems clear that there was a willful and wanton disregard of the property rights of the plaintiff. The credit manager was an experienced business executive. The jury was not obliged to believe that he acted in good faith and that the trespass thus committed was merely the result of inadvertence and poor judgment. Reasonable argument could be made that Young showed an utter disregard for the rights of the plaintiff. The case is analogous to *Pelton v. General Motors Acceptance Corporation,* 139 Or. 198 (7 P. (2d) 263, 9 P. (2d) 128), wherein a finding of punitive damages was upheld. The verdict seems large to the writer, but no complaint was made in the briefs with reference

to such matter and we pass the same without further comment. The evidence tends to show that the Graybar Electric Company is a wealthy concern and the jury, in the exercise of its discretion, no doubt thought $1,500 a proper amount to be assessed in order to deter the company and others similarly inclined from resorting to such methods of collection. At any rate we can not say, as a matter of law, that the verdict rendered is the result of passion and prejudice.

It follows that the judgment against the defendants Graybar Electric Company, Inc., and A. B. Young is affirmed. The judgment against the General Electric Company is reversed and the action as to it is dismissed.

RAND, J., dissents.

———

ROSSMAN, J. (dissenting). Punitive damages are not recoverable merely because a conversion took place. The plaintiff must prove, not only that a conversion occurred but also that defendant's wrongful act was attended with aggravating circumstances. Many decisions in support of this statement are collected in 17 C. J., Damages, p. 1026. In the present instance, a debt was owing from the plaintiff to the General Electric Company on consigned merchandise. In fact, it was not really a debt; the sums, long overdue, were trust funds. The plaintiff had derived them from consigned goods. The defendant Young, in his efforts to collect the account, made many calls at the plaintiff's place of business, but payment was not forthcoming except for a small sum paid on account. Upon plaintiff's shelf were several switches and plates which the plaintiff had been unable to sell. They became the subject matter of the conversion mentioned by the

majority. Upon one of Young's numerous calls at the plaintiff's store when the plaintiff, as on other occasions, was absent, Young told Shorthill that he would willingly accept these plates and switches in lieu of cash and thus settle the account. He suggested that the plaintiff had been unable to sell these items. When Shorthill replied that he had no authority to part with these items Young requested him to speak to the plaintiff, stating that he would call again. Sometime later Young called again. At first, Shorthill said that this later call occurred the day following the visit when Young made the settlement offer, but later it developed that he was not sure. Young swore that three or four days elapsed between the two calls. Upon the second visit the plaintiff was again absent. Young again expressed his willingness to accept the merchandise in lieu of cash. Shorthill again said that he had no authority to pay the account in that manner and declared that he had not seen the plaintiff since Young's first call. Young then took the articles, made out a complete inventory and, after Shorthill declined to accept it, left it upon the plaintiff's desk. A credit memorandum was promptly mailed to the plaintiff, and a day or two later when Young met the plaintiff on the street Young gave him an account of all that had occurred. In the above occurrences no rough language was used by any one, no force was employed, no customer was embarrassed and no threats were made. We add that everything was done openly and no effort was made to conceal anything which Young had done. Somehow, Young had arrived at the conclusion that he could lawfully take the merchandise. Without a doubt he believed that such a settlement was advantageous to both parties. Here we have a conversion, but no aggravating circumstances. The following is taken from *Davis v.*

*Aetna Acceptance Co.*, 293 U. S. 328 (55 S. Ct. 151, 79 L. Ed. 393):

"The respondent contends that the petitioner was liable for a willful and malicious injury to the property of another as the result of the sale and conversion of the car in his possession. There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception. Such a case was McIntyre v. Kavanaugh, 242 U. S. 138, 37 S. Ct. 38, 61 L. Ed. 205, where the wrong was unexcused and wanton. But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. Boyce v. Brockway, 31 N. Y. 490, 493; Laverty v. Snethen, 68 N. Y. 522, 527, 23 Am. Rep. 184; Wood v. Fisk, 215 N. Y. 233, 239, 109 N. E. 177; Stanley v. Gaylord, 1 Cush. (Mass.) 536, 550, 48 Am. Dec. 643; Campau v. Bemis, 35 Ill. App. 37; In re De Lauro (D. C.) 1 F. Supp. 678, 679. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one. * * *"

Moreover, this court has repeatedly held that a corporation is not liable in punitive damages for a wanton or malicious act of its agent unless the evidence shows that the corporation authorized the agent to act maliciously, or unless it appears that the corporation, after having acquired knowledge of the wanton or malicious manner in which the act was done, ratified the agent's conduct: *Pelton v. General Motors Acceptance Corp.*, 139 Or. 198 (7 P. (2d) 263, 9 P. (2d) 128); *Gill v. Selling*, 125 Or. 587 (262 P. 812, 58 A. L. R. 1556); *Sullivan v. Oregon Ry. & Nav. Co.*, 12 Or. 392 (7 P. 508, 53 Am. Rep. 364). The evidence, in my opinion, proves neither authorization nor ratification.

For the reasons above stated, I dissent.