## WHITE v. PACIFIC TELEPHONE & TELEGRAPH CO.

### No. 12981.

District Court, D. Oregon.

Oct. 1, 1938.

Eugene C. Libby and Barge E. Leonard, both of Portland, Or., for plaintiff.

Carey, Hart, Spencer & McCulloch, Omar C. Spencer, and Howard T. McCulloch, all of Portland, Or., and Samuel L. Wright, of San Francisco, Cal., for defendant.

McCOLLOCH, District Judge.

This is an action for alleged assault and battery by the defendant Telephone Com-

pany's chief special agent, H. A. Hansley. The evidence tended to show that the Telephone Company suspected plaintiff, an old employee, of connection with a hold-up of the company's offices in the City of Portland. A former convict appeared at the city police station in Portland shortly after the hold-up, and turned over a blue-print map of the floor of the Telephone Company's building on which the robbery occurred. He stated that the map had been given to him by plaintiff about six months previously, and that plaintiff at that time urged him and another person to hold up the company's offices, exactly as had occurred, but that he declined the proposition. Presumably, he was turning in the map to clear himself of suspicion.

Based on this and other evidence, the Telephone Company obtained a warrant for plaintiff's arrest, and plaintiff was taken into custody by the Portland police and confined in the city jail. At the time of his arrest plaintiff was ill, according to the testimony of himself and of his wife, and after being taken to the jail, where he was questioned for three days, plaintiff was returned after each questioning to the jail's infirmary.

On the third day, after midnight, Hansley, who had come to Oregon from his headquarters in California to investigate the case, was permitted by the Portland police to question plaintiff alone. A microphone had been installed in the room in which the questioning took place, and police officers listened to what occurred in the room, by means of a loud speaker and head sets installed in another room.

Plaintiff testified that Hansley became enraged because plaintiff declined to confess connection with the robbery, and that Hansley struck him two hard blows at the base of the skull, one on each side of his head; that he lost consciousness and remembered nothing until some weeks later, when he regained his senses in a hospital in Portland.

The officers listening in testified, contra, that they heard no blows struck, and attendants at the jail testified that plaintiff walked out of the room where he had been confined with Hansley, and rode in the elevator to the police infirmary, to all appearances entirely normal.

Shortly after the alleged assault, plaintiff was sent to the Good Samaritan Hospital and remained there for some weeks, as stated. There was testimony on behalf of defendant indicating that plaintiff feigned unconsciousness during the entire period.

### Prior Amnesia.

It was undisputed, however, that about six months previously, plaintiff, while in Montana, suffered a loss of memory, and that he was missing for about ten days.

Medical testimony attributed the amnesia occurring in Montana to syphilis, which was disclosed by tests after plaintiff was returned to Portland and while he was under the general care of the defendant company's physician. There was testimony that plaintiff's condition was incurable.

Plaintiff is middle aged, and there was testimony that the syphilis might have been latent for a prolonged period, and possibly, although not probably, congenital. Plaintiff himself testified that his first knowledge that he had syphilis came from the tests after his return to Portland, following loss of memory in Montana. Plaintiff is married, and has three boys, 20, 18 and 17 years of age. Plaintiff held a responsible technical position with the Telephone Company, and had been in its employ for twenty-four years.

The jury awarded $2,625 actual damages, and $9,750, punitive damages, and this opinion will deal with two of the points urged in support of motion for a new trial. (Ruling was made at the oral argument adverse to defendant on the other points urged for a new trial.)

Defendant's points to be considered now are: (1) That, under the Oregon decisions, a corporation cannot be held liable in punitive damages for the tortious acts of employees, unless the acts were expressly authorized or subsequently ratified; (2) alleged error in instructions defining "scope of authority".

### Punitive Damages for Torts Committed by Corporation Employees.

The early case of Sullivan v. Oregon Ry. & N. Company, 1885, 12 Or. 392, 7 P. 508, 53 Am.Rep. 364, used the following language [page 517]: "I think the rule upon the subject laid down in Cleghorn v. New York Cent. & H. R. R. Co. 56 N.Y. 44 [15 Am.Rep. 375], the correct one, which makes the master liable for such damages when he is chargeable with gross neglect in the employment or retention in his services of an incompetent serv-

ant, knowing at the time of his unsuitability, or that he authorized or ratified the act of the servant in the particular case."

Later Oregon cases dealing with punitive damages are: Bingham v. Lipman, Wolfe & Company et al., 40 Or. 363, 67 P. 98; Kingsley v. United Rys. Co., 66 Or. 50, 133 P. 785; Scibor v. Oregon-Washington R. & N. Co., 70 Or. 116, 140 P. 629; Gill v. Selling et al., 125 Or. 587, 267 P. 812, 58 A.L.R. 1556; Pelton v. General Motors Acceptance Corporation, 139 Or. 198, 7 P.2d 263, 9 P.2d 128; and McCarthy v. General Electric Co. et al., 151 Or. 519, 49 P.2d 993, 100 A.L.R. 1370.[1]

Bingham v. Lipman, Wolfe & Company et al., supra, opinion by Chief Justice R. S. Bean, upheld an award of punitive damages for false imprisonment. The Court said, at pages 371, 372, 67 P. at page 101 of the opinion: "It is argued, however, that the rule should not be applied in an action against a corporation for an injury caused by the misconduct of its agents or servants, unless the act was previously authorized or subsequently ratified by the board of directors or other governing body of the corporation. Upon this question there is a conflict of judicial opinion. Mr. Thompson, in his late work on Corporations, expresses the view that the doctrine maintained by the majority of the state courts is that 'the rule of respondeat superior, which makes a corporation liable for the malicious torts of its agents or servants, makes it liable in exemplary damages for such torts, whether the act were originally authorized or subsequently ratified by its governing body or not.' 5 Thomp.Corp. § 6384. For 'the true theory is that the rule of exemplary damages is a rule, not of logic, but of public safety; that the public know the corporation only through its ministerial agents and servants; that the corporation touches the public only by the hands of these agents and servants; and that consequently, so far as the public rights are concerned, they are to be regarded as the corporation, precisely as the doctrine of respondeat superior identifies the principal and his agent for the purpose of protecting third persons.' Id. § 6389. Whatever the true rule may be, however, where it is sought to charge a corporation with exemplary damages on account of the ma-

licious acts of its subordinate agents, there can be no room for controversy that where, as in this case, the officers actually wielding the whole executive power of the corporation participated in and directed all that was planned and done, their malicious, wanton, or oppressive intent may be treated as the intent of the corporation itself, for which it is liable to answer in exemplary damages. Denver & R. G. R. Co. v. Harris, 122 U.S. 597, 7 S.Ct. 1286, 30 L.Ed. 1146."

It will be observed from the closing sentence of the quotation that Chief Justice Bean distinguished the Bingham Case from the prior Sullivan Case, which involved an assault by a railway conductor on a passenger, on the ground that the defending corporation's representatives in the Bingham Case were more than "subordinate agents." They were, he said, "officers * * * wielding the whole executive power of the corporation * * *."

The later cases of Pelton v. General Motors and McCarthy v. General Electric, supra, have maintained this distinction.

### Acts of Credit Manager Binding on Corporation.

In the Pelton Case, it was charged that the credit manager of a corporation had authorized the unlawful repossession of plaintiff's automobile. The McCarthy Case, which also involved repossession of personal property, dealt also with the acts of a credit manager. While it is true, as stated by defendant's counsel, that there was ratification in the Pelton Case, because the finance company, for whose account the automobile had been repossessed, did not return the automobile, after learning that the repossession was unlawful, and while it is further true that the repossessed goods likewise appear not to have been returned in the McCarthy Case, I feel that the cases are authority for the proposition that, under Oregon law, a credit manager of a corporation enjoys sufficient rank and authority to bind corporation in punitive damages for malicious and wanton acts committed in the supposed interest of the corporation.

In the present case, Mr. Hansley was chief special agent of the defendant Telephone Company, a large public utility,

[1] The Pelton and McCarthy Cases are discussed in 11 Or.L.Rev. 298, and 15 Or. L.Rev. 158, respectively.

carrying on extensive operations in a number of states. He had been in the Company's employ twenty-four years. He had been chief special agent since 1928.

■ The duties of chief special agent of a large utility are matters of common knowledge. Such an officer is the chief of the police force, if it may be put that way, of the company for which he works. Normally, as testified to by witness Wise, Vice-President of the defendant company for Oregon, Mr. Hansley reported to Mr. Wise when he came to Oregon on cases, and he reported to Mr. Wise during all of the time he was working on the White case. Proof, however, of the chief special agent's broad authority and independence in action is furnished from Mr. Wise's own testimony that he had no recollection of Hansley's reporting the circumstances which occurred at the police station in the early hours of the final day of questioning, when the effort was made to obtain a confession from White. This was the time when White alleged he was assaulted.

■ In view of the Oregon decisions, I have no hesitation in holding that Mr. Hansley, as the chief special agent of the Telephone Company, had sufficient rank and authority to impose punitive liability on his corporate employer for tortious acts committed within the scope of his employment.[2]

Scope of Employment.

Defendant challenges the following instructions: "The main fact in this case is whether you believe the plaintiff's story, that he was struck by the defendant's agent Hansley. If you don't believe his claim in that respect, if you are not satisfied of it by a preponderance of the evidence, then you must find for the defendant. But you must further find, before you can fix liability on the defendant, that Hansley was acting within the scope of his employment. That means that you must find that he reasonably felt that what he was doing was in the interest of his employer and was not a willful act on his part, or not in disregard of any express instruc-

tions he might have been given on the subject. That does not mean, however, that he must have been expressly authorized by his superiors to take any action of this sort, if he did take such action. And so, if you find from a preponderance of the evidence that he struck White, and that he was acting within the scope of his employment, then your verdict must be for the plaintiff, and it will be your duty to assess his damages.

\*   \*   \*   \*   \*   \*

"The sole questions for your decision, I repeat, are, whether Hansley struck White while acting within the scope of his authority; and, if so, the damages to be allowed."

I quote from defendant's brief: "The court erred in that portion of the instructions to the jury wherein it was stated, in substance, that if the defendant's agent, H. A. Hansley, reasonably felt that what he was doing was in the interest of his employer and that (if) it was not a willful act on his part or not in disregard of any express instructions, such belief on the part of the agent would constitute proof of his agency and that he was acting within the scope of his employment sufficient to fix liability on his principal, the defendant herein."

And further:

"Scope of the employment of an agent is not fixed or determinable by the agent's belief that in performing a certain act he is acting for the interest of his principal."

\*   \*   \*   \*   \*   \*

"Specifically, the defendant contends that the scope of the agent's employment cannot be fixed and determined by the belief of the agent and that merely because an agent reasonably felt that what he was doing was in the interest of his employer, such belief is not determinative of whether or not the act was, in·fact, within the scope of the agency."

Further quoting from the brief:

"Restatement of the Law of Agency, Section 228, defines in general terms the phrase 'scope of employment' as follows:

---

[2] "Punitive Damages in Tort Cases" is the title of a scholarly article to be found in 44 Harv.L.Rev. (1931), ·1173. The portion of the article dealing with the punitive liability of masters for the acts of their servants appears at pp. 1199–1205. Clarence Morris, Brandeis Re-

search Fellow (1930–31) of the Harvard Law School, is the author.

Two early notes in the Central Law Journal are interesting and helpful. (41 Central Law Journal (1895) 308; 55 Central Law Journal (1902) 105). The author of the article in Volume 41 is Seymour D. Thompson.

"'Scope of Employment

"General Statement

"'(1) Conduct of a servant is within the scope of 'employment, if, but only if:

"'(a) it is of the kind he is employed to perform * * *;

"'(b) it occurs substantially within the authorized time and space limits * * *;

"'(c) it is actuated, at least in part, by a purpose to serve the master * * *'.

"This general statement is extensively enlarged and analyzed in subsequent sections of the Restatement of the Law of Agency, but it seems clear that the general statement quoted shows the erroneous character of the court's instructions. In substance, the court's instruction covered only (c) above, and entirely eliminates (a) and (b). The court's instruction, rather than the rule above quoted, would simply read:

"'Conduct of a servant is within the scope of employment if * * * (c) it is actuated, at least in part, by a purpose to serve the master.'

"Such, we submit, is not a correct statement of the definition of the term 'scope of employment.'"

Counsel for defendant contended throughout the trial that the assault charged to Hansley by the plaintiff was, as a matter of law, without the scope of Hansley's employment.

Defendant moved for a directed verdict as follows:

"Mr. McCulloch (counsel for defendant): 'Defendant Pacific Telephone and Telegraph Company moves for a directed verdict for the reason that there is no evidence sufficient to support a verdict under the allegations of the amended complaint.

"'For the second reason that there is a total absence of proof of any authorization or authority or facts sufficient to constitute any agency on the part of Hansley, through whom it is alleged the assault and battery mentioned in the complaint was committed, and there is no evidence that he was acting within the scope of his authority, inherent, implied or express.'"

Later, at the time of taking exceptions to the instructions, occurred the following:

"Mr. McCulloch: 'And also (meaning a further exception) with respect to the instruction of the Court that if Hansley felt that he was acting for the interest of his employer it would constitute an act within his agency.'

"The Court: 'Mr. McCulloch, in that connection, do you still maintain the position that his act was, on all the evidence, outside of his authority?'

"Mr. McCulloch: 'That is correct.'"

Defendant Requested No Instruction
Re Scope of Authority.

Defendant's counsel requested no instruction submitting the question whether Hansley acted within the scope of his employment as a question of fact for the jury. On the contrary, defendant's position was, as stated, that the assault, if committed, was without the scope of Hansley's authority, and that defendant was, for that reason, entitled to a directed verdict. The plaintiff's position was the opposite—that Hansley's actions were clearly within the scope of his employment.

In short, as to whether Hansley had acted within the scope of his authority, both parties claimed that, as a matter of law, there was no question for determination by the jury. Under these circumstances, it may have been my privilege to choose between the opposing theories of counsel, but I did not do that. I took a middle road and submitted to the jury the only question of fact involved in determining whether Hansley acted within his scope of authority, which seemed to me at all doubtful under the testimony, that is, whether Hansley was actuated in what he did by the desire to serve his employer.

Complete answers, so it seems to me, to counsel's criticism that I failed to submit the other two ingredients, which go to determine scope of authority (a) whether the act was of the kind Hansley was employed to perform, and (b) whether the act occurred substantially within the authorized time and space limits of Hansley's employment, are, first, that counsel did not request me to submit any instruction on these points; secondly, it was my opinion, which I still hold, that no question of fact existed, on the record, under sub-divisions (a) and (b), as defined by the Restatement.

As to (a): Hansley being the head police officer of the defendant company, and acting directly in this particular case under the Oregon Vice-President of the company, the plaintiff having been arrested at the defendant company's instance,

clearly Hansley's alleged acts were "of the kind" he was employed to perform.

As to (b): certainly there was no question as to the time and space limits of the chief special agent's authority. Hansley had come to Oregon especially to work on the White case.[3]

Mansfield v. Wm. J. Burns International Detective Agency, 102 Kan. 687, 171 P. 625, L.R.A.1918D, 571, is a case similar, on the facts, to the present case. There the defendant detective agency was held liable for punitive damages on account of an assault by one of its agents while endeavoring to obtain a confession.

### Two Interesting Cases from the Second Circuit.

Cain v. Alpha S. S. Corporation, 35 F.2d 717, and Nelson v. American-West African Line, 86 F.2d 730, both arising in the Second Circuit Court of Appeals, are helpful on the questions here presented.

In the first named case, a subordinate officer of a ship assaulted a seaman. Circuit Judge Swan states the general rule in such cases, at page 719, second column of the opinion: "The rule of the common law, as established by the weight of modern authority, imposes liability upon an employer for an assault committed by one of his employees upon another, when the former is in a position of authority and acts within the general scope and line of his employment." (Citing many cases, including an annotation in 18 L.R.A.,N.S., 416, and 8 Harv.Law Rev. 383 (for historical review by Prof. Wigmore.)

The opinion in the Nelson Case, decided in 1936, is by Circuit Judge Learned Hand, and is in his characteristic style.

A drunken boatswain had struck a seaman in his berth in order to awaken him to go on watch. The defendant contended that the boatswain was acting without the scope of his authority, because it was not time for the assaulted seaman to go on duty, from which it was sought to be deduced that the boatswain was merely carrying out his own drunken personal ideas. Judge Hand said: "A principal is not chargeable with willful acts, intended by the agent only to further his own interest, not done for the principal at all. [Citing cases and Restatement of Agency, § 235.] But motives may be mixed; men may vent their spleen upon others and yet mean to further their master's business; *that meaning, that intention is the test.*" (Italics mine.) (Citing cases and Restatement of Agency, Section 236, Section 245, comment "(d)".

The above is quoted from page 731, second column, of the opinion.

The cases foregoing point the moral in this case. Clearly, if Hansley thought he might get a confession from White, after failing to do so by severe questioning and other methods, by striking White, Hansley's thoughts and intentions were properly for the jury. No dispute existed as to the other two ingredients, which go to determine whether an agent has acted within the scope of his employment.[4]

For the reasons given, the motion for new trial is denied.

---

[3] It will be observed that the challenged instruction told the jury that Hansley must have acted within the scope of his employment, in order to hold the defendant corporation.

In the absence of a requested instruction by the defendant, probably a further definition of "scope of employment" was not called for. Viewed in this light, submitting the question of Hansley's intention was more favorable to defendant than it was entitled to, considering that defendant's position at all times was, that there was no question of scope of employment in the case on the facts presented.

[4] Pursuant to Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. —, 114 A.L.R. 1487, we look to the Oregon decisions for the substantive law controlling the case.

Lake Shore & Michigan Southern Railway Company v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97, one of the principal authorities relied on by defendants herein, is referred to by the Supreme Court in Erie Railroad Company v. Tompkins, supra, as dealing with one of the subjects of so-called "general law", hereafter to be dealt with as a matter of "local law."

Schultz v. Brown, 9 Cir., 256 F. 187, was an early case in this Circuit. One Montana sheepherder had assaulted another in a range dispute. Whether the belligerent was acting within the scope of his employment was held to be a question for the jury. While, as all Westerners know, a sheepherder is confronted with many situations calling for the exercise of independent judgment, it is submitted that agent Hansley's rank and station in the present case involved much greater authority and responsibility.